**Benjamin JONES et al., Plaintiffs,**

**v.**

**James T. LYNN et al., Defendants.**
**Civ. A. No. 72–3621.**

United States District Court,
D. Massachusetts.

Feb. 12, 1973.

---

Daniel D. Sullivan and Patrick J. King, Boston, Mass., for plaintiffs.

Lewis H. Weinstein, Sandra S. Grobman, Foley, Hoag & Eliot, Boston, Mass., for Christian Science Church and others.

John C. Conley, Gen. Counsel, Arthur G. Coffey, Asst. Gen. Counsel, Boston Redevelopment Authority, Boston, Mass., for BRA and others.

Joseph H. Rosenshine, Boston Mass., for Jacet Construction Corp., Wasserman Development Corp., and Mary Wasserman.

James N. Gabriel, U. S. Atty., Frederic R. Kellogg, Asst. U. S. Atty., for George Romney, Sec. of U. S. Dept. of H. U. D. and others.

## OPINION

CAFFREY, Chief Judge.

This is a civil action commenced by twelve individual plaintiffs who allege they are acting on behalf of a class consisting of all residents or former residents of the Fenway urban renewal area in Boston, Massachusetts. It is alleged that the class also includes those operators of businesses within the area who say they have been injured or will be injured as a result of the decrease of availability of decent low income housing in the Symphony area and by the change in the character of the neighborhood, as described in extensive detail in the complaint. The defendants in the complaint as presently amended are James T. Lynn, Secretary of the Department of Housing and Urban Development (HUD), the Administrator of the Department of Housing and Urban Development for Region 1, the Director of the Department of Housing and Urban Development for the Boston area, the First Church of Christ, Scientist, the individual members of its governing board, the Church Realty Trust and one of its individual trustees, the Boston Redevelopment Authority (BRA), the individual members and the director of the BRA, Jacet Construction Corporation, Wasserman Development Corporation, and Max Wasserman.

The 48-page complaint has not as yet been answered by the parties defendant, and is the subject of pending motions attacking it for non-compliance with Rule 8(a)(1) and (2) of the Federal Rules of Civil Procedure. The matter came before the court on the basis of plaintiffs' amended motion for temporary injunctive relief. Prior to the hearing on the application for injunction a number of conferences of and with counsel were held as a result of express orders of this court, and this court's decision has been delayed for several weeks because of what can most charitably be described as wrangling between three counsel for the plaintiffs and more than a half dozen counsel for the various parties defendant. Eventually a stipulation of certain facts was filed in connection with the hearing. The court accepted in evidence 27 exhibits, and the plaintiffs called one witness, Edward Tiecher. Midway through the cross-examination of Mr. Tiecher the hearing was terminated by order of this court because by that time the Court was of opinion that the stipulation and the exhibits established adequate grounds for

a ruling on the application for injunctive relief and the Court was further of opinion that the testimony of the witness proffered would not materially add to plaintiffs' case, for the reason that the Court was singularly unimpressed by the witness' qualifications and credibility, and it was becoming more apparent as the cross-examination developed that the witness was a disgruntled former employee of the BRA whose suggestions relative to this project had been rejected by the then BRA Director Edward Logue. Accordingly, the Court determined that nothing was to be gained by spending additional time to complete the cross-examination of a witness whose testimony on direct would not have been accepted by this Court for the purposes offered.

The injunctive relief sought, included a prayer for an order restraining defendants Lynn, Barry and Richardson (the HUD defendants) and all those acting under them from granting mortgage insurance for the Huntington Avenue Apartments, from continuing to process a mortgage insurance application filed by the Wasserman Development Corporation under Section 220 of the National Housing Act, 12 U.S.C. § 1715k, and from executing on behalf of HUD a contract for mortgage insurance and related documents concerning the Huntington Avenue Apartments (Project No. Z23–32024). Plaintiffs also sought to enjoin defendants Wasserman Development Corporation, Max Wasserman and Jacet Construction Corporation from taking any action in furtherance of the construction of the Huntington Avenue Apartments prior to the issuance of an Environmental Impact Statement for the apartment project. These defendants have stipulated that they will submit the Wasserman development to the appropriate HUD office for environmental clearance procedures. Consequently, this portion of the application for injunction is not presently before the Court.

Plaintiffs also seek to enjoin Lynn, Barry and Richardson (the HUD defendants), and the BRA and its Executive Director, from proceeding with the development and implementation of the so-called "Symphony" section of the Fenway Urban Renewal Project (R–115). The portion of the application for injunctive relief regarding the Symphony section, however, specifically exempts from its scope the Church Park development (Parcel 11), the Morville House development (Parcel 16), and certain rehabilitation work on enumerated residential and commercial parcels which were approved prior to the date of the application for injunction.

Lastly, plaintiffs seek to enjoin the HUD defendants, the First Church of Christ, Scientist, Church Realty Trust, and the BRA, from continuing to plan, develop, and displace families, individuals, or businesses, in the proposed "core park" area located on Massachusetts Avenue between Falmouth and Norway Streets. As part of this last application for injunctive relief, plaintiffs also seek an order preventing the demolition of any structure presently located on Massachusetts Avenue between Falmouth and Norway Streets and the closing of any contract for the construction of park facilities or improvements in that area.

An amendment to the application for an injunction, filed on February 5, requests that if any injunction is entered it exempt from the parcels covered in the original application for injunction, the Burbank Apartments (Parcel 16–B–1); any plans the Church may have concerning the demolition of its administration building or the renovation of the Mother Church building; and the plan to develop Disposition Parcel No. 5 in its entirety, since this parcel is planned for a high rise tower for low income elderly housing.

The parties stipulated that the issue to be ruled on by the court in this case would be the request for injunctive relief based on Claim C of Plaintiffs' complaint which alleges the necessity for the obtaining of an Environmental Impact Statement under Section 102(2)(C) of the National Environmental Policy Act

of 1969 (NEPA), 42 U.S.C. § 4332 *et seq.*, on the grounds that failure to obtain such a statement violates the Congressional policy as enunciated in the National Environmental Policy Act. Plaintiffs assert that a comprehensive study and understanding of the potential impact on the environment must be obtained before any major action is taken relating to the on-going development of this project.

In resolving the question of whether or not the plaintiffs have shown themselves to be entitled to injunctive relief on the basis of the stipulated facts and the exhibits admitted in evidence at the hearing held on February 8, this court must determine whether or not the plaintiffs have shown (1) that immediate and irreparable harm will result to them if this court declines to grant injunctive relief, and (2) that there exists a probability that plaintiffs will ultimately prevail on the merits upon a full trial. Automatic Radio Mfg. Company v. Ford Motor Company, 390 F.2d 113, 115 (1 Cir.1968).

The basis for the ruling to be made on this application for preliminary injunction consists of the following facts found in the stipulation of the parties and documentary exhibits admitted in evidence.

The Fenway Urban Renewal Plan (Pl.Ex. 5), dated November 1, 1965, was approved by the BRA on November 24, 1965. It was approved by the Boston City Council on December 20, 1965, by the Mayor of Boston on December 23, 1965, by HUD on March 17, 1967, and by the Commonwealth of Massachusetts Department of Commerce and Development (now Department of Community Affairs) on April 26, 1967, after the required public hearings. On December 22, 1967, the BRA and the United States of America executed a Loan and Capital Grant Contract (Pl.Ex. 1) to provide federal urban renewal assistance to the BRA to carry out the Fenway Urban Renewal Project. This contract authorized the BRA to sell project loan notes up to $14,488,759. This authorization included a relocation grant of $719,804 and a capital grant of $8,651,134. The difference between the federal grants and the total loan authorization represents the approximate city and state contribution to this project.

On August 28, 1968, an amendatory contract amending the Loan and Capital Grant Contract was · executed by the BRA and the United States adding a rehabilitation grant of $12,000 (Pl.Ex. 2). On June 24, 1970, a second amendatory contract was executed which increased the authorized interest to be paid on temporary loan notes to be sold by the BRA (Pl.Ex. 3). On August 11, 1972, a third amendatory contract (Pl.Ex. 4) was executed which increased the relocation grant to $5,660,424 because of increased relocation benefits granted by the federal government. This amendatory contract also increased the current temporary loan authorization to $19,441,374. The contract did not increase the capital grant.

The Fenway urban renewal area contains approximately 506 acres. The Fenway Plan consists of three land use sub-areas: the Symphony area, the Museum area, and Medical Center area. The Symphony area is to be revitalized and redeveloped for residential and commercial use, while the Museum and Medical Center areas will continue to be used primarily as the site of many of Boston's leading educational and cultural institutions.

The redevelopment in the Fenway Urban Renewal Project is to be carried out pursuant to the provisions of the Housing Act of 1949, 42 U.S.C. § 1450 et seq., which provides for a contractual relationship between a locality as represented by a Local Public Agency (LPA), in this case the BRA, and HUD. The locality must present a Workable Program for Community Improvement to HUD. HUD then reviews the proposed program and certifies the availability of federal assistance. 42 U.S.C. § 1451(c). A loan or a grant, or both, may be made from the federal government to the locality. The Secretary of HUD may es-

tablish reasonable requirements for the program which must be complied with prior to the entering into a contract with the locality. These requirements operate as conditions precedent to the formation of the contract. 42 U.S.C. § 1453. In implementing the program of urban renewal, which HUD monitors, the local agency must comply with the conditions of the contract. The Secretary of HUD can commence any action to enforce any right required by him under the contract. 42 U.S.C. § 1456(c). This statutory scheme thus provides for local adoption of a plan, adjustment of the plan to meet HUD requirements, and, finally, entry into an enforceable contract relationship with HUD. San Francisco Tomorrow v. Romney, 472 F.2d 1021, n. 1 (9th Cir., 1973).

According to the stipulation of the parties, the balance sheet prepared by the BRA reflecting the budget of the Fenway Project as of December 31, 1972 indicates the approved budget for the Project Area excluding relocation payments is $13,768,950. The BRA has incurred costs through December 31, 1972 of $11,039,652.64 and has entered into obligations which result in encumbrances of $862,978 which leaves an unallocated portion of the approved budget in the amount of $1,866,319.36. The approved relocation budget is $5,660,424 against which $985,506.01 represents costs incurred through December 31, 1972.

The Fenway Project area is composed of Parcels 1 through 15, 16A, 16B-1, 16B-2, 17 through 19, 19A, 19B, and 20 through 23. Of these parcels, Parcels 1, 4, 8, 10, 14, 17, 18, 19, 19A, 19B, 20, 21, 22 and 23 are parcels that may become available for renewal activity, but there are no present plans for acquiring these parcels, since BRA activities are conditional on certain other acts taking place prior to the availability of these parcels.

As of February 1, 1973, the remaining Disposition Parcels, namely, Parcels 2, 3, 5, 6, 7, 9, 11, 12, 13, 15 and 16, had reached the following stages with respect to development:

*Parcel 2*: This parcel was developed by the Colonnade Trust on land assembled by the Church Realty Trust and sold by it to the Colonnade Trust. The Colonnade Hotel has been completed and occupied for over one year on this site and this parcel is not subject to the complaint in this action.

*Parcel 3*: Disposition Parcel 3 consists of the properties located at 150–182 Huntington Avenue (plus 8 Cumberland Street). This parcel is presently used as a parking lot open to the public, and is scheduled for development by the Wasserman Development Corporation of a 320 unit middle income development with commercial space to be provided on the ground floor. The apartment complex is to be insured under Section 220 of the National Housing Act, as amended. The parties to this case have entered into a stipulation which will subject the development of this complex to Environmental Clearance procedures.

*Parcel 5*: The State Street Development Company of Boston has been tentatively designated by the BRA as developer of a tower for elderly persons which will be approximately 32 stories in height and will contain approximately 388 low and middle income elderly housing units with commercial space on the ground. floor. Construction is anticipated in the summer or early fall of 1973, contingent upon a commitment from HUD under Section 236 of the National Housing Act. In their amendment to their request for preliminary injunction plaintiffs sought to remove Parcel 5 from possible restraints imposed upon development in the Fenway Urban Renewal Project for the apparent reason that an injunction could endanger a commitment by the FHA for mortgage insurance estimated in the amount of 12.4 million dollars. Plaintiffs apparently feel that the development of this project is in the best interests of the members of their class and thus would prefer that the restraints imposed by the National Environmental Policy Act not apply to this parcel.

*Parcel 6*: The structures on this parcel have been demolished and the plan calls for the use of this parcel to be residential with commercial facilities on the lower floors. Plans will be finalized for the development of this parcel when the parcel 5 financing is concluded.

*Parcel 7*: Parcel 7 is occupied by approximately 44 apartments and 3 businesses. There has been no demolition on this parcel and the parcel is being considered for rehabilitation.

*Parcel 9*: The buildings on this parcel are still standing. The Fenway Plan calls for the development of this parcel with low and middle income housing financed through the Section 236 program. It is anticipated that a building similar to the one proposed for Parcel 5 will occupy this parcel.

*Parcel 11*: An 11-story building has been constructed on this parcel by the United Company on land sold to it by the Church Realty Trust. The structure contains 508 units of housing, 515 closed parking spaces and approximately 60,000 square feet of commercial space on the ground floor level. This parcel is not subject to the relief sought by the plaintiffs in this action.

*Parcel 12*: The buildings on this parcel are still standing. Development of this parcel has been delayed pending the completion of Parcel 11. The Plan calls for the development of 300 low-middle income units with commercial use of the ground floor, but no developer has been selected.

*Parcel 13*: The buildings on this parcel are still standing. The BRA has tentatively designated Boylston Towers Association as developer of this parcel. Boylston Towers Association has submitted a preliminary design proposing the development of a multi-level building with the highest element consisting of 28 stories. This structure is proposed to contain approximately 376 middle income housing units, approximately 345 parking spaces and commercial space on the lower levels. The developer's proposal as submitted calls for this project

to be insured under the Section 220 program.

*Parcel 15*: This parcel is presently occupied by Police Substation No. 16 and is slated to be rehabilitated by the Institute of Contemporary Art with commercial space on the ground floor for restaurant use.

*Parcel 16A*: The BRA sold this parcel to Morville House in February of 1971 for the construction of 147 low-middle elderly units. The structure is basically completed and is scheduled for occupancy on March 1. Commercial space will be provided on the ground floor. The Project was insured and subsidized under the Section 236 program of the National Housing Act. Plaintiff has specifically requested that this parcel be excluded from the operation of any injunction which might issue from this Court.

*Parcel 16B–1*: This parcel was sold to Federal Realty Association Company for rehabilitation of the existing three buildings on the site. Completion is scheduled for the spring and plaintiffs have requested that this parcel be excluded from the scope of the injunction requested.

*Parcel 16B–2*: A park is scheduled to be constructed on this parcel which has been cleared of the structures previously occupying it.

HUD defendants have determined that NEPA does not apply to the 220–284 Massachusetts Avenue buildings and the HUD defendants have not evaluated the Environmental Impact of the demolition of said buildings and the displacement of the families, individuals, and businesses therefrom pursuant to NEPA. The 220–284 Massachusetts Avenue buildings have been owned by the Church Realty Trust since before 1930. These buildings are scheduled to be cleared and the site landscaped, with the entire project carried out exclusively with Church funds. Upon completion, this area will constitute a landscaped plaza along Massachusetts Avenue from Falmouth to Norway Streets, extending to the new portico of the Mother

Church. Since no transfer of ownership has ever been contemplated with regard to this property, the Fenway Plan does not designate the property as a disposition parcel.

HUD defendants have determined that NEPA does not apply to the Fenway Urban Renewal Plan and have not reviewed the Fenway Urban Renewal Plan as approved by HUD on March 17, 1967, pursuant to the special Environmental Clearance procedures established by HUD pursuant to the National Environmental Policy Act.

Before 1965 the Christian Science Center (hereinafter the Church Center) consisted of the original Mother Church and its domed extension completed in 1894 and 1906, respectively, the Christian Science Publishing Society building completed in 1934, and an administrative building completed in 1914. The Church defendants have acquired real estate in the Symphony area since the early 1900's in the realization of the Church's needs for additional administration space. In the early 1960's the Church defendants commissioned the architectural firm of I. M. Pei and Associates, Architects and Planners, 385 Madison Avenue, New York, New York, to prepare a master plan for the development of the Church property in the area bounded by Massachusetts and Huntington Avenues and by Belvidere Street and in the adjacent residential and commercial areas on Massachusetts and Huntington Avenues. I. M. Pei and Associates prepared a Master Development Plan Interim Report dated April 22, 1964. The First Church of Christ, Scientist and I. M. Pei and Associates entered into an owner-architect agreement on October 21, 1965. On May 10, 1966, defendant Church Realty Trust applied to defendant BRA for authorization and approval of the Church Center development as an urban redevelopment project to be conducted pursuant to Massachusetts G.L., c. 121A, as amended. A chapter 121A project involves development or redevelopment of blighted open areas, decadent areas and substandard areas by an urban redevelopment trusteeship. Such projects in the City of Boston must be approved by the BRA, acting as the local planning board, and by the Mayor of the City of Boston. Both the BRA and the Mayor approved the Church Realty Trust application to conduct a chapter 121A project. Pursuant to the Church defendants' chapter 121A project plans, which were subsequently approved in August, 1966 by the BRA and the City of Boston, the following buildings were constructed: a two-and-one-half story Sunday School with an auditorium seating 1,100 people; a 26 story administration building; a General Services building which is five stories high and 525 feet long; a 700 foot reflecting pool; and a 550 car underground parking garage.

The Christian Science Center consists of the chapter 121A project, the Original Mother Church and its domed extension, the Christian Science Publishing Society Building, and the open planted site to be developed after demolition of both the Church administration building abutting former St. Paul Street and the buildings located at 220–284 Massachusetts Avenue. The Church defendants have already invested approximately 55 million dollars in the Christian Science Center upon the assumption that the project would go through to completion and are committed to spend more than 5 million dollars in addition thereto in order to complete the Christian Science Center substantially as planned. The Church defendants provided relocation assistance to approximately 200 residential tenants relocated from the area of the Christian Science Center. The BRA did not provide relocation assistance to those 200 tenants.

In connection with the Church defendants' plans for the improvement of the International Headquarters, the Mother Church entrance is being altered (see P.L.Ex. 16) and a large portico extension is to be constructed. The new portico cannot be constructed unless the old administration building abutting former St. Paul Street can be demolished. In

connection with demolition of this administration building and construction of the portico, the buildings owned by defendant Church Realty Trust located at 220–284 Massachusetts Avenue are intended to be demolished to complete the Church Center plans. (See P.L.Ex. 11.)

The 220–284 Massachusetts Avenue buildings are owned by Church Realty Trust. These buildings have been owned by Church Realty Trust since before 1930. The administration building was built by the Church defendants and completed in 1914. This building is presently used solely by the Church defendants as an administration building. The property now occupied by the 220–284 Massachusetts Avenue buildings will be cleared and landscaped. This work will be carried out with Church funds. The open, planted site to be created after clearance of the Massachusetts Avenue buildings (from Falmouth to Norway Streets) will lie between Massachusetts Avenue and the portico of the Mother Church and will form the entrance plaza of the Mother Church and of the International Headquarters for the First Church of Christ, Scientist. If the buildings at 220–284 Massachusetts Avenue were to remain in place, this new portico and front entrance of the Church would face directly into the rear of the Massachusetts Avenue buildings.

In addition to land described as the Christian Science Center, the Church defendants also own land included as disposition parcels in the Fenway Urban Renewal Plan. No federal or state funds have been utilized by the Church defendants to acquire any of the real property owned by them. The Church defendants will not redevelop the disposition parcels they own but will rely upon private developers who will qualify as to experience, staff and financial ability to accomplish such redevelopment in accordance with the Fenway Urban Renewal Plan.

Because parcels 3, 5 and 9 are disposition parcels in the Project, pursuant to Mass.G.L., c. 121B, section 46, and the provisions of the Fenway Urban Renewal Plan, the BRA must approve and designate such private developers regardless of the fact that the Trustees own Parcel 3 and portions of Parcels 5 and 9. There exists a Cooperation Agreement (Pl.Ex. 14) between BRA and the Church defendants for Parcels 2 and 11 (formerly owned by Church defendants), for Parcel 3 (entirely owned by Church defendants) and for Parcels 5 and 9 (partially owned by Church defendants).

The power of eminent domain was not used to assemble the land in the Christian Science Center. In assembling this land, the Church purchased Falmouth and St. Paul Streets and portions of Clearway, Belvidere, Dalton and Norway Streets from the City of Boston in 1967 after public hearings before the Public Improvements Commission and the City Council. No eminent domain power was used to acquire any of the property within this triangular area.

The Church defendants have offered to assist the tenants at 220–284 Massachusetts Avenue with relocation assistance, including counselling, referral service and recommendations of sources of vacancies. The BRA has offered these tenants relocation assistance pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.

The National Environmental Policy Act of 1969 (NEPA), *supra*, established new national policy, goals and procedures for protecting and enhancing the environment. This Act governs federal departments and agencies and requires their systematic attention to the environmental consequences of all federal activities.

On March 4, 1970 the President issued Executive Order No. 11514 (35 Fed.Reg. 4247) which directed heads of agencies to monitor, evaluate and control their agencies' activities so as to protect and enhance the quality of the environment.

On April 23, 1971 the Council on Environmental Quality (CEQ) issued

guidelines regarding statements on proposed federal actions affecting the environment (36 Fed.Reg. 7724) which require heads of agencies to establish procedures for implementing Section 102(2)(C) of NEPA.

NEPA and CEQ guidelines require that prior to "major federal acts significantly affecting the quality of the Human Environment" an assessment of environmental consequences shall be made in the form of an Environmental Impact Statement, which must be circulated for comment by federal, state and local agencies as provided in the CEQ guidelines, and then revised as needed. Pursuant to the Executive Order and CEQ guidelines, the Department of Housing and Urban Development circulated Circular 1390.1 (July 16, 1971) entitled "Departmental Policies, Responsibilities and Procedures for Protection and Enhancement of Environmental Quality" (Pl.Ex. 10). Section 3A of the HUD circular states:

"A final Environmental Statement shall accompany the proposed" major federal "action through HUD's review and decision processes."

HUD Circular 1390.1 is the Department's interpretation of the procedures necessary to implement the purpose and goals of the NEPA which requires that "to the fullest extent possible" an Environmental Impact Statement be included in every proposal for a "major federal actions significantly affecting the quality of the Human Environment." NEPA, 42 U.S.C. § 4332(2)(C). NEPA specifically requires that in preparing Environmental Impact Statements on major federal actions a detailed statement must be made by the responsible officer with reference to:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C)(i, ii, iii, iv, v).

The term "environment" is not defined in the Act itself nor in the CEQ Guidelines. However, HUD Draft Circular 1390.1 defines the term as follows:

"It is clear from Section 102 in the Act and elsewhere that it is broadly defined to include physical, social and aesthetic dimensions, and that interdisciplinary analysis are required well beyond the normal technical and economic considerations. Examples of environmental considerations are: air and water pollution, erosion control, natural hazards, land use planning, site selection and design, subdivision development, conservation of flora and fauna, urban congestion, overcrowding, displacement and relocation resulting from public or private action or natural disaster, noise pollution, urban blight, code violations and building abandonment, prevention of suburban sprawl, etc."

In its guidelines of April 23, 1971, the CEQ states that the policy behind the use of Environmental Impact Statements required by Section 102(2)(C) is that "(a)s early as possible and in all cases prior to agency decision concerning major action or recommendation or a favorable report on legislation that significantly affects the environment, federal agencies will, in consultation with other appropriate Federal, State and local agencies, assess in detail the potential environmental impact in order that adverse effects are avoided, and environmental quality is restored or enhanced, to the fullest extent practicable."

Section 5(a)(ii) of the CEQ Notice recites that "actions" include but are not limited to:

"Projects and continuing activities: directly undertaken by Federal agencies; supported in whole or in part through Federal contracts, grants, subsidies, loans or other forms of funding assistance; involving a Federal lease, permit license, certificate or other entitlement for use."

Section 5(b) of the CEQ notice reads as follows:

"The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated). Such actions' may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. Proposed actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases. In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action. The lead agency should prepare an environmental statement if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal action. 'Lead agency' refers to the Federal agency which has primary authority for committing the Federal Government to a course of action with significant environmental impact. As necessary, the Council on Environmental Quality will assist in resolving questions of lead agency determination."

Section 5(c) states in part:

"Significant effects can also include actions which may have both beneficial and detrimental effects, even if, on balance, the agency believes that the effects will be beneficial."

Section 11 of the notice entitled "Application of Section 102(2)(C) procedure to existing projects and programs" provides as follows:

"To the maximum extent practicable the section 102(2)(C) procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."

The HUD draft circular attempts to apply the general CEQ guidelines to the particular problem of implementing NEPA to HUD activity. Section 4(a) of the circular says that

"Normal Environmental Clearances shall be established to assure a consideration of alternatives and suitable environmental conditions for all project approvals, including major changes or amendatories to an approved project, but excluding insurance on individual houses."

Section 4(c) states that

"Final section 102(2)(C) environmental statements shall be completed for a limited number of projects or amendatories whose environmental issues cannot be satisfactorily resolved in spe-

cial clearance and for all applications and major amendatories under the following:

(i) New Communities activities under Title VII, including debt guarantee, interest loan, grant for waiver of tax exemption, and certification of eligibility, and

(ii) Title X (large scale subdivisions)."

In those situations where Section 102(2)(C) environmental statements are required, they must be filed with the CEQ and made available to the appropriate agencies and to the public (1) in draft form at least 90 days before HUD approval of, or commitment to, the proposed action, and (2) in final form at least 30 days before HUD approval of, or commitment to, the proposed action.

Counsel have directed this Court's attention to two recent decisions of the Court of Appeals for the First Circuit, City of Boston v. Volpe, 464 F.2d 254, filed July 17, 1972, and Silva v. Romney, 473 F.2d 287, filed February 2, 1973. Both of these cases dealt with the requirement of an Environmental Impact Statement, and a reading of the two opinions tends to leave the reader with some doubt as to whether or not the more recent opinion in *Silva* represents a departure by the Court of Appeals, in whole or in part, from the philosophy expressed in City of Boston v. Volpe. Whatever doubt may exist as to the possible change of philosophy or legal approach between the two opinions need neither be developed nor resolved herein, because the legal issue which apparently most concerned the Court of Appeals in both of those cases was basically keyed to the question "when does significant federal action begin" and whether or not the beginning date of such significant federal action is controlling with regard to the existence of federal jurisdiction and the consequent necessity for an Environmental Impact Statement under NEPA.

In the instant case, the federal action is at the other end of the spectrum since herein we are not primarily concerned with when federal action first took place but, rather, when significant federal action last took place. Another way of posing the question herein is to ask whether or not significant federal action had been concluded prior to January 1, 1970, because if that question on the instant record is to be answered affirmatively, there is no legal requirement for the filing of an Environmental Impact Statement under NEPA.

■ An analysis of the facts established by the stipulation and exhibits reveals that the basic document in this entire controversy, the Loan and Capital Grant Contract, was executed between the BRA and HUD acting for the United States on December 22, 1967. The record also shows that there have been since that date three amendments to this basic Loan and Capital Grant Contract, none of which alone, nor all three taken together, can fairly be characterized as "major federal action." Only two of the three amendments subsequent to December 22, 1967 occurred after January 1, 1970. One of these amendments, that of June 24, 1970 (Pl.Ex. 3), increased the interest rate to be paid on temporary loan notes sold by the BRA. The amendment of August 11, 1972 (Pl.Ex. 4) increased the relocation grant and the current temporary loan authorization.

Plaintiffs' primary argument is that NEPA applies to the uncompleted aspects of the Fenway Urban Renewal Project, even though the project itself received federal approval prior to the January 1, 1970 enactment date of NEPA. Plaintiffs cite Section 11 of the CEQ Guidelines which states that "to the maximum extent practicable the Section 102(2)(C) procedure should be applied to further major Federal actions even though they arise from projects . . . initiated prior to enactment of the Act. . . ."

Plaintiffs cite various cases where federal courts have enjoined projects initiated prior to January 1, 1970 pending compliance with Section 102(2)(C). Lathan v. Volpe, 455 F.2d 1111 (9 Cir.

1971); Brooks v. Volpe, 460 F.2d 1193 (9 Cir. 1972); Arlington Coalition v. Volpe, 458 F.2d 1323 (4 Cir. 1972); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 757 (E.D. Ark.1971); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971).

The cases cited by plaintiffs do not apply to the factual situation presented to this Court. As the Court of Appeals for the First Circuit pointed out:

> "The concept of [NEPA] was that responsible officials would think about environment before a significant project was launched; that what would be assessed was a proposed action, not a *fait accompli*; that alternatives to such action would be seriously canvassed and assayed; and that any irreversible effects of the proposed action would be identified." City of Boston v. Volpe, 464 F.2d 254, at 257.

The plaintiffs' cited cases involve controversies emanating from the Federal Highway Program and from other projects initiated and executed by the federal government. The plethora of cases that have applied NEPA to the Federal Highway Program take cognizance of the fact that federally aided highway planning is carried out in "a number of discrete stages, with federal approval necessary at each stage: a state's highway 'system'; a particular highway's location; its design; its plans, specifications and estimates; and, finally, its construction." Id. at 258–259.

Courts have taken the position that there is major federal action at each stage of highway development and thus a post-1970 approval of a single stage would require an impact statement even though planning was initiated prior to 1970.

In the urban renewal context a major design change requiring amendment to the renewal plan, and thus requiring amendment to the Loan and Grant Contract, might well be found to be a major federal action for purposes of NEPA.

But in this case there have been no such post-1970 amendatories and the federal government does not have the same power to review and alter urban renewal plans at later stages of development that it has in the case of federally financed highway projects.

Thus for the purposes of NEPA, major federal action terminated in the case of the Fenway Plan as a whole on December 22, 1967 when the United States became contractually bound to contribute to the financing of the Fenway Urban Renewal Plan.

■ It appears clear that Congress did not intend that NEPA be applied retroactively in cases where federal authorities could not unilaterally order alternative courses of development after review of the information made available by the environmental impact analysis. See San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9 Cir. 1973).

As the court stated in Arlington Coalition v. Volpe, 458 F.2d 1323, 1331 (4 Cir. 1972):

> "At some stage, federal action may be so 'complete' that applying the Act could be considered a 'retroactive' application not intended by the Congress."

Such is the case of the federal action in this controversy. HUD's post-1970 involvement has been primarily limited to supervision of the BRA's execution of the renewal plan to insure that BRA executes that plan in conformity with the Loan and Grant Contract. (See Pl.Ex. 1, sec. 103(b).)

To require an impact statement to be filed on the project as a whole would be to establish the principle that NEPA requires the mechanics of review even where there is no power to change the project design. This was not Congress' intent.

■■ It should, however, be noted that in those cases where the federal government finances or insures the mortgage financing for development of disposition parcels within the Fenway Urban Renewal Project, those federal

actions will have to be analyzed according to HUD's regulations regarding environmental clearances. Furthermore, should major alterations in the Fenway Plan occur at some future date, federal approval of such amendments to the plan might at that time be found to constitute "major federal action" and thus then require a review of the amendments under NEPA.

In summary, I find and rule that plaintiffs have failed to sustain their burden of showing probability of success on the merits on Claim C in their complaint.

■ It should be noted that an additional ground exists for the denial of injunctive relief as against the Church defendants, with respect to the Church Center, since on the record before this Court there has not been at any time, from at least 1930 to date, significant federal action with regard to this purely private renewal project undertaken by the Church of Christ, Scientist, and its related entities at their own expense.

For all of the foregoing reasons an order will be entered denying plaintiffs' motion for a preliminary injunction against the defendants in this action.