**CITY OF BOSTON, Plaintiff-Appellant,**

v.

**John A. VOLPE et al., Defendants-Appellees.**

**No. 72–1092.**

United States Court of Appeals, First Circuit.

Heard June 6, 1972.

Decided July 17, 1972.

Peter Koff, Asst. Corporation Counsel, with whom Herbert P. Gleason, Corporation Counsel, and Lawrence J. Ball, Asst. Corporation Counsel, were on brief, for appellant.

Neil L. Lynch, Boston, Mass., for Massachusetts Port Authority, appellee.

Jeffrey N. Shane, United States Dept. of Transportation, with whom Kent Frizzell, Asst. Atty. Gen., Joseph L. Tauro, U. S. Atty., Terry Philip Segal, Asst. U. S. Atty., and Edmund B. Clark, Atty., Dept. of Justice, were on brief, for John A. Volpe, etc., and others, appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Appellant, the City of Boston, appeals from the denial of a preliminary injunction which would have restrained the

Massachusetts Port Authority [Port Authority] from continuing construction of the Outer Taxiway at Logan Airport, pending decision on the merits of Boston's complaint that many federal statutes and regulations have not been complied with in connection with the processing of the Port Authority's request for a federal airport development grant.[1] In seeking preliminary relief against the Port Authority, Boston stressed its contentions that the federal appellees, the Secretary of the Department of Transportation [DOT] and the Administrator of the Federal Aviation Administration [FAA] have violated, principally, the National Environmental Policy Act of 1969 [NEPA], 42 U.S.C. § 4332(C), and dependent regulations, and, secondarily, the Airport and Airway Development Act of 1970, 49 U.S.C. § 1716, in allocating funds for an airport project without first issuing a detailed environmental impact statement or finding that the project is consistent with local plans and interests and that the Port Authority

has legal authority to engage in the development.[2]

In early 1970, FAA gave its general approval to the Port Authority's Airport Layout Plan to construct an Outer Taxiway in the Bird Flats area on the southwest side of Logan Airport. In December of 1970 the Port Authority began work on the project. In February of 1971, it forwarded a request for aid to FAA, together with a "negative declaration" that no significant adverse environmental impact was foreseen. Copies were sent to regional and state clearing houses. The Boston Redevelopment Authority responded that the planning was unacceptable, in view of the threats of noise and future harbor filling to the continued viability of plans for trying to rehabilitate an adjacent area, Jeffries Point, where a waterfront park had long been planned for a deteriorated community. The Port Authority, in the meantime, began to bring in fill to the construction site. In May FAA allocated $1,100,000 for construction. Shortly

1. The complaint charges in Count One, violation of 42 U.S.C. § 3334, Demonstration Cities and Metropolitan Development Act of 1966 [submission of federal grant applications for review of areawide agency charged with regional planning oversight], Office of Management and Budget Circular A–95 [advance notification to state and regional clearinghouse of intent to apply for federal assistance], 42 U.S.C. § 4231, Intergovernmental Cooperation Act of 1968 [coordinate federal programs with local and areawide planning], 49 U.S.C. § 1716, Airport and Airway Development Act of 1970 [airport projects to be consistent with plans of area planning agencies; no authorization of project having adverse effect on environment, without finding that no feasible alternative exists]; in Count Two, violation of 42 U.S.C. § 4321 et seq., National Environmental Policy Act of 1969 [requirement of early, comprehensive agency environmental impact statement], Executive Order 11514, 35 Fed.Reg. 4247 (1970) [federal agencies to provide leadership to meet national environmental goals], Guidelines of the Council on Environmental Quality for Statements on Proposed Federal Actions Affecting the Environment, 36 Fed.Reg. 7724 (1971) [assessment "as early as possible" prior to

agency decision concerning major action of potential environmental impact and exploration of "alternative actions that will minimize adverse impact"], Department of Transportation Orders 5610.1 (1970) and 5610.1A (1971) [guidelines for government preparation and distribution of environmental impact statement], and Federal Aviation Administration Order 5050.2 (1971) [requested actions involving runway extensions to include detailed environmental statement, without exception]; in Count Three, violation of 49 U.S.C. § 1653(f), Department of Transportation Act of 1966 [special effort to preserve natural beauty of park and recreation lands], 49 U.S.C. § 1716(d) [no approval of an airport project without prior public hearing].

2. The claims, though presented as separate, are necessarily interrelated in that the Airport and Airway Development Act establishes the mode of federal participation in airport development, which is determinative of the point at which the federal government becomes a partner with a local authority so that the local authority becomes subject to the strictures both of that act and of the National Environmental Policy Act.

thereafter Boston arranged a conference in Washington to make known its objections to the summary procedure and to the environmental disadvantages of the project. Notwithstanding FAA's advice that it would withhold approval until problems were resolved, the Port Authority forwarded a project application and even awarded a contract for construction. In July DOT announced that the Port Authority's application had been returned "until an environmental impact statement is prepared and circulated in accordance with the National Environmental Policy Act". Since then, the Port Authority has submitted a draft impact statement to FAA, which has received comments from various agencies and has submitted a revised draft to DOT. No final statement has yet been issued. In the meantime, preparatory work has gone forward and, in April 1972, construction began.

■ This chronology, of course, is far from that ordained by the letter and the spirit of the National Environmental Policy Act. The concept of that Act was that responsible officials would think about environment *before* a significant project was launched; that what would be assessed was a *proposed* action, not a fait accompli; that alternatives to such action would be seriously canvassed and assayed; and that any irreversible effects of the proposed action would be identified.[3] The executive branch guidelines made even more clear that the purpose of the statute was to "build into the agency decision process" environmental considerations, "as early as possible", taking into account "the overall, cumulative impact of the action proposed (and of further actions contemplated)" and "environmental consequences not fully evaluated at the outset of the project or program". 36 Fed. Reg. 7724 (1971).

DOT has been even more specific in its requirements, calling for an environmental impact draft "at the earliest practicable point in time . . . so that the analysis of the environmental effects and the exploration of alternatives . . . are significant inputs to the decision-making process." DOT Order 5610.1 (Oct. 7, 1970). The order adds that "When there is doubt whether or not to prepare a statement it should be prepared." In DOT Order 5050.2 (Dec. 7, 1970), the Department required that any applicant for assistance in extending or adding a runway submit a draft environmental statement, noting that a "negative declaration" was permitted in only limited circumstances, and that, where there has been previous federal funding, a full statement is required "[i]f an irrefutable showing cannot be made that [environmental] consequences were fully evaluated at the time of initial . . . funding".

■ A belated effort to comply with NEPA may or may not prove to be as unlikely an enterprise as adding yeast to an unleavened loaf. But that is not the question presently before us. That is, before we face the validity of any federal action subject to the National Environmental Policy Act—and the Airport and Airway Development Act—we must ask whether the action now being taken by the Port Authority and sought to be enjoined by Boston is yet a federal action. A project does not necessarily become "federal" at the point when an agency fails to follow mandated procedures—agencies may be subject to duties concerning a proposed federal action at a time when an applicant may not yet be enjoined from acting on its own. The first issue, then, is not whether the federal agencies have failed to follow the procedures, but whether, assuming such failure, a preliminary injunction should be issued—not against the agencies—but against the Port Authority.[4]

■ Appellant relies on several factors to make the project "federal", all

---

3. *See* 42 U.S.C. § 4332.

4. In the court below, appellant abandoned its claim to preliminary relief against the federal defendants.

but one of which can be disposed of briefly. Appellant was unable to convince the district court that the previously constructed Inner Taxiway and the Outer Taxiway here involved are so interrelated as to make the latter a federal project because federal funds helped to finance the former. We do not accept the general proposition that once the federal government has participated in a development, that development is necessarily forever federal. Many projects have federal assistance at an exploratory stage and are then completed through wholly local or state funding. The question, then, is a factual one, and nothing in the present record persuades us that these projects, for funding purposes separate, should be treated as one for the purpose of identifying the time when the action of the Port Authority becomes federal action. Nor does the Port Authority's present intention eventually to seek federal funds for yet another stretch of taxiway make the Outer Taxiway a federal project. Similarly, the adoption of certain federal standards and specifications in the hope of qualifying for federal assistance cannot transform a state or local project into a federal one. This is not to say that the past and the future are irrelevant in assessing the environmental impact of a present project for which federal funds are sought.[5]

■ More complicated is appellant's contention that the process of obtaining federal funding for the Outer Taxiway itself has progressed to the point where the project has become federal. What has happened, in brief, is that a state authority, fully empowered to raise and spend funds for airports, has "requested" a federal grant, 14 C.F.R. § 151.-21(a), the federal agency has made a "tentative allocation" of funds for the project, 14 C.F.R. § 151.21(b), and the authority has then submitted a formal application, 14 C.F.R. § 151.21(c). The essence of appellant's position is an asserted analogy between "tentative allocation" of airport aid and those stages in the approval of federal aid highways which have been held to make a highway federal for this purpose.[6] Apart from this analogy, the cases cited by appellant deal with the adequacy of agency procedures to comply with the National Environmental Policy Act, see Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm., 146 U.S.App.D. C. 33, 449 F.2d 1109 (1971); Greene County Planning Bd. v. FPC, 455 F.2d 412 (2d Cir. 1972), cases relevant only if we first find the Outer Taxiway to be a federal project.

We turn to the proffered analogy. Federal aid highway planning is carried out in a number of discrete stages, with federal approval necessary at each stage: a state's highway "system"; a particular highway's location; its design; its plans, specifications and estimates; and, finally, its construction.

---

5. The Guidelines of the Council on Environmental Quality, 36 Fed.Reg. 7724 (1971), state: "In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action . . . . ." § 5(iii) (b).

6. The relationship between the stages of highway approval and the National Environmental Policy Act has been the subject of a considerable volume of litigation. Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971); Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332 (3d Cir., Apr. 28, 1972); Arlington Coalition Transportation v. Volpe, 458 F.2d 1323 (4th Cir., Apr. 4, 1972); Morningside-Lenox Park Ass'n v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971).

*See* La Raza Unida v. Volpe, 337 F.Supp. 221, 224 (N.D.Cal.1971). The progression reflects an effort at orderly decision-making, providing for a narrowing of focus at each stage, with no pressure on the state seeking federal aid to telescope the stages into one, or, correspondingly, on the federal agency to make decisions on all stages at once. This perhaps grows out of the complexities of the federal highway statute, the need for coordination within and among the states, and the expectation of Congress that all states would participate significantly in each of the federal aid highway systems. In all of the cases in which a court found a highway to be federal, the federal government had at least granted location approval. And while location approval does not carry with it a commitment of funds, it is a decision, in the ordinary course final, that a federal aid highway is approved for a particular location and that the focus for the next set of hearings and review will be not the same question but the more specific one whether a particular design meets the relevant standards.

In contrast, the airport aid scheme contemplates, so far as the statute is concerned, a single decision to fund or not to fund a project. 49 U.S.C. § 1716. Without statutory compulsion, the federal defendants have promulgated a regulation authorizing the making of a tentative allocation of funds, 14 C.F.R. § 151, which they interpret to be "preliminary and tentative in nature", fundamentally an administrative device for budgetary and program planning. Their interpretation is of course entitled to great weight, especially since the phrase "tentative allocation" is in this context their own.

The salient feature of a tentative allocation of airport aid, as opposed to highway location approval, is that while the whole of a proposed airport project thereby receives a generally favorable reaction, the whole is in the ordinary course given closer scrutiny before final decision. The staged federal approval system for highways may be likened to the successive reviews of an architect's plans, beginning with a broad conceptual rendering of a house in its setting and ending with detailed drawings of plumbing, outlets, and joists. The more simple approval scheme for airport development grants is closer to that of one who first selects qualified bidders and then awards the contract.

The specifically environmental regulations of the Department of Transportation confirm the intended distinction between the decision processes employed in the highway and airport programs. DOT Orders 5610.1 and 5610.1A define "federal actions" as including, in addition to grants and other financial assistance, "approval of State highway programs and plans prior to grant of money", but make no mention of tentative allocations for airport or any other financial assistance. Finally, nothing in the present record indicates that as a matter of practice a tentative allocation is more binding than the words themselves or the representations of the federal defendants suggests. We are persuaded, at least for the purposes of ruling on the propriety of the denial of a preliminary injunction, that a tentative allocation, followed by an application for airport development aid, does not so federalize a project that all work must stop until a satisfactory environmental impact statement has been issued by a putative federal grantor.

It may well be urged that too little sanction remains, if a state project is allowed to wreak damage on the environment. To the extent to which the sanction is less here than under other federal programs, that is attributable to the nature of airport aid. A state may, after all, proceed with construction wholly independently of the federal government.[7] Where the state authority does rely on the expectation of federal aid, it goes ahead with construction prior to approval only at great risk to

7. *See* New Windsor v. Roman, 329 F.Supp. 1286 (S.D.N.Y.1971).

the prospects for funding, since the options of the federal agency became increasingly limited to bald approval or rejection with no opportunity for modification. While it is perhaps true that a state or other non-federal entity might have the funds to finance any specific project, it is straining credulity to suggest that such an entity would remain indifferent to the leverage of federal funding.[8] Perhaps it would make a calculated judgment to proceed with an environmentally questionable project if a sufficiently high state priority were assigned to it, and non-federal funds were available; or, conversely, it might proceed cavalierly if the project were indisputably likely to receive a favorable impact statement. But in most cases a state or community would be sensitive to its environmental obligations, not only to avoid jeopardizing its chances of obtaining assistance for the specific project, but also to avoid a negative report on future projects associated with the same facility. For, as we have noted, the federal agencies cannot close their eyes to ill-advised actions of the past as they assess a project in the present.

We therefore hold that the district court did not err in ruling that Boston is unlikely to prevail on the merits of its request for an injunction against the Port Authority. We also rule that the court did not abuse its discretion in excluding certain evidence relevant to the merits of an environmental statement, to alleged inadequacies of procedure, and to irreparable harm. Irreparability of harm was assumed by the court and the other issues are not yet properly before it.

Affirmed.

8. Moreover, in the generality of cases, though not here, an airport authority would take further pause from the fact that, with minor exceptions, federal aid

cannot be awarded for costs incurred prior to the execution of the grant agreement. 49 U.S.C. § 1720(a) (2).