NORTH GEORGIA BUILDING AND CONSTRUCTION TRADES COUN-CIL, Plaintiff-Appellant,

v.

Neil Edward GOLDSCHMIDT et al., Defendants,

Maynard Jackson, etc., et al., Defendants-Appellees.

No. 77-1581.

United States Court of Appeals, Fifth Circuit.

July 15, 1980.

Joseph Jacobs, James T. Langford, Harris Jacobs, Atlanta, Ga., Terry R. Yellig, Washington, D. C., for plaintiff-appellant.

Ferrin Y. Mathews, Atlanta, Ga., Murray F. Bahm, Bernard R. Thomas, Atlanta, Ga., for City of Atlanta defendants.

John D. Sours, Robt. O. Fleming, Jr., Atlanta, Ga., for Associate General Contractors of America, etc. & Georgia Highway Contractors Association.

Carin A. Clauss, Sol. of Labor, Alvin Bramow, Act. Associate Sol., Bobbye D. Spears, Regional Sol., Gail V. Coleman, Atty., Dept. of Labor, Washington, D. C., William L. Harper, U. S. Atty., Atlanta, Ga., Barbara A. Harris, Asst. U. S. Atty., Atlanta, Ga., for United States.

Thomas X. Dunn, Terry R. Yellig, Washington, D. C., for Building and Construction Trades Dept., AFL–CIO.

Before COLEMAN, Chief Judge, and RONEY and FAY, Circuit Judges.

RONEY, Circuit Judge:

In this case involving procedures for the determination of prevailing local wage rates under the Davis-Bacon Act, 40 U.S.C.A. §§ 276a—276a–5 for federally funded projects, we make three significant decisions. *First*, the Davis-Bacon Act and its regulations apply to a project which federal agencies and the builder anticipate will receive federal funding, even though federal funds have been neither formally applied for nor authorized at the time of bid opening. *Second*, under Davis-Bacon Act regulation 29 C.F.R. § 1.7(b)(1) (1979), which governs the procedure for modification of project wage determinations, telephone notice by a Department of Labor official of a decision to modify a determination is insufficient to constitute receipt of the modification. *Third*, once an objection has been raised to a federal contracting agency's decision to apply a particular general wage determination category to a project covered by the Davis-Bacon Act, the

regulations, 29 C.F.R. § 5.12 (1979), require that the controversy be submitted to the Secretary of Labor.

The Davis-Bacon Act requires that laborers on federal Government construction projects be paid, at a minimum, the wages prevailing on similar local projects.[1] Contending that bid specifications for construction projects at the Hartsfield-Atlanta International Airport included improperly determined wage rates, plaintiff North Georgia Building and Construction Trades Council, an organization of labor unions, brought suit to enjoin the City of Atlanta from receiving bids or awarding contracts based on those specifications.[2] The district court denied North Georgia's motion for a preliminary injunction and subsequently granted summary judgment in favor of defendants. We affirm in part and reverse and remand in part.

The facts of this case are best revealed against the backdrop of the procedures prescribed by regulation for implementation of the Davis-Bacon Act. Following a careful delineation of these procedures, the facts will be recounted and the legal issues discussed.

## PROCEDURES FOR IMPLEMENTING THE DAVIS–BACON ACT

■ The purposes of the Davis-Bacon Act are to protect the employees of Government contractors from substandard wages and to promote the hiring of local labor rather than cheap labor from distant sources.[3] The Airport and Airway Development Act of 1970, 49 U.S.C.A. §§ 1701–1727, which authorizes federal funding assistance for local airport projects, requires the application of the Davis-Bacon Act to contracts for the construction of projects so assisted.[4]

The Secretary of Labor is empowered to determine prevailing local wage rates, and

1. Section 276a(a) provides in part:
   The advertised specifications for every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction, alteration, and/or repair, including painting and decorating, of public buildings or public works of the United States or the District of Columbia within the geographical limits of the States of the Union, or the District of Columbia, and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed, or in the District of Columbia if the work is to be performed there; and every contract based upon these specifications shall contain a stipulation that the contractor or his subcontractor shall pay all mechanics and laborers employed directly upon the site of the work, unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications . . . ..

2. Federal officials in the Department of Labor, the Department of Transportation and the Federal Aviation Administration were also named as defendants in this suit. On appeal, however, the federal Government has submitted a brief which supports the position of plaintiff North Georgia. An attorney from the Department of Labor also participated in oral argument in support of North Georgia.

   An *amicus curiae* brief submitted by the Building and Construction Trades Department, AFL–CIO, also supports the position of North Georgia. The Associated General Contractors of America, Inc. (Georgia Branch) and the Georgia Highway Contractors Association, Inc. filed an *amicus curiae* brief supporting the position of the City of Atlanta.

3. *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 176–77, 74 S.Ct. 438, 441, 98 L.Ed. 594 (1954); S.Rep. No. 963, 88th Cong., 2d Se s. ——, *reprinted in* [1964] U.S.Code Cong. & Admin.News, pp. 2339, 2340–41.

4. Section 1722(b) provides:
   All contracts in excess of $2,000 for work on projects for airport development approved under this subchapter which involve labor shall contain provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended, which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

to promulgate reasonable regulations to implement the Act.[5]  There are two distinct procedures for determining the wage rates applicable to a particular project.  First, a "general wage determination" may be issued and published in the Federal Register for use in a locality in which wage rates are well settled and a large volume of Government contracting is anticipated.[6]  The general determination for a particular locality specifies wage rates for particular trades by category of construction project.  The Secretary classifies projects into four categories: "building," "residential," "heavy" and "highway." [7]  The classification system, though not mandated by either the Act or accompanying regulations, is an administrative convenience based on historical patterns in the construction industry.[8]  Once published, a general determination has no expiration date, but must be kept current by timely modification.[9]

The federal contracting agency, rather than the Department of Labor, may initially decide which category is applicable to a project, and incorporate the appropriate set of rates into its bid proposal.[10]  If no question is raised as to the agency's classification, bidding and contracting proceed.

On the other hand, a "project wage determination," specifying the set of wage rates applicable to a particular project, will be issued by the Department of Labor at the request of the contracting agency.[11]  The Department, in making a project determination, may select a category of general determination rates already set by publication in the Federal Register, or, if no appropriate rates have been published, may make a fresh determination of prevailing wages for each job on the project.  Project determinations are effective for 120 days after issuance, unless that period is extended under certain conditions.[12]  Bidding and contracting follow the issuance of a project determination.

The procedure for and effectiveness of modifications by the Department of Labor

5.  40 U.S.C.A. §§ 276a, 276c.

6.  29 C.F.R. § 1.5(b) (1979) provides:
    Whenever the wage patterns in a particular area for a particular type of construction are well settled and whenever it may be reasonably anticipated that there will be a large volume of procurement in that area for such a type of construction, the Administrator [of the Wage and Hour Division, Department of Labor], upon the request of a Federal agency or in his discretion, may issue a general wage determination when, after consideration of the facts and circumstances involved, he finds that the applicable statutory standards and those of this part will be met.

7.  *See, e. g., Virginia ex rel. Comm'r, Va. Dep't of Highways & Transp. v. Marshall*, 599 F.2d 588, 593 (4th Cir. 1979); *Tennessee Roadbuilders Ass'n v. Marshall*, 446 F.Supp. 399, 401 (M.D.Tenn.1977); *North Ga. Bldg. & Constr. Trades Council v. United States Dep't of Transp.*, 399 F.Supp. 58, 59 n.1 (N.D.Ga.1975).

8.  *See Nello L. Teer Co. v. United States*, 348 F.2d 533, 534, 172 Ct.Cl. 255 (1965), *cert. denied*, 383 U.S. 934, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966).

9.  29 C.F.R. § 1.7(a)(2) (1979) provides:
    General wage determinations issued pursuant to § 1.5(b) and which are published in the *Federal Register*, shall contain no expiration date.  These general wage determinations shall be modified, and the modifications published in the *Federal Register*, on a timely basis to keep them current.

10.  *See Tennessee Roadbuilders Ass'n v. Marshall*, 446 F.Supp. at 401; *North Ga. Bldg. & Constr. Trades Council v. United States Dep't of Transp.*, 399 F.Supp. at 60.

11.  *See* 29 C.F.R. § 1.5(a) (1979).

12.  29 C.F.R. § 1.7(a)(1) (1979) provides:
    Project wage determinations initially issued shall be effective for 120 calendar days from the date of such determinations.  If such a wage determination is not used in the period of its effectiveness it is void.  If it appears that a wage determination may expire between bid opening and award, the agency should request a new wage determination sufficiently in advance of the bid opening to assure receipt prior thereto.  However, when due to unavoidable circumstances a determination expires before award and after bid opening, the Administrator upon a written finding to that effect by the head of the Federal agency in individual cases may extend the expiration date of a determination whenever he finds it necessary and proper in the public interest to prevent injustice or undue hardship or to avoid serious impairment in the conduct of Government business.

to existing general determinations and project determinations are governed by regulation. Modifications of a general determination are applicable to a project unless "published in the *Federal Register* later than 10 days before the opening of bids." [13] If publication occurs during that period, the modifications are effective only when the contracting agency "finds that there is a reasonable time in which to notify bidders of the modification." [14]

Similarly, modifications of a project determination prior to the award of the contract are applicable unless received by the contracting agency "later than 10 days before the opening of bids." [15] In that event, the modifications are likewise effective only if the contracting agency "finds that there is a reasonable time in which to notify bidders of the modification." [16]

■ Any question arising as to the contracting agency's classification of a construction project, or as to the Department of Labor's project determination, must be submitted to the Secretary of Labor for interpretation or a ruling. [17] The Secretary's decisions are "authoritative," and may be relied upon by parties involved. [18] If the decision results in a modification of a prior determination, the above-discussed 10-day rule, if applicable, controls the effectiveness of that modification.

The Secretary's decisions may be appealed to the Wage Appeals Board, a body created by regulation and authorized to act with finality on behalf of the Secretary of Labor. [19] The Board has jurisdiction, *inter alia*, over wage determinations and "controversies concerning the payment of prevailing wage rates or proper classifications which involve significant sums of money, large groups of employees, or novel or unusual situations." [20] A wage determination may be appealed by any "interested person," including a contractor or labor organization, who has unsuccessfully sought reconsideration of the contested decision. [21] Other controversies may be presented to

13. 29 C.F.R. § 1.7(b)(2) (1979) provides in part:
   All actions modifying a general wage determination shall be applicable thereto, but modifications published in the *Federal Register* later than 10 days before the opening of bids shall not be effective, except when the Federal agency . . . finds that there is a reasonable time in which to notify bidders of the modification.

14. *Id.*

15. 29 C.F.R. § 1.7(b)(1) (1979) provides in part:
   All actions modifying an original project wage determination prior to the award of the contract or contracts for which the determination was sought shall be applicable thereto, but modifications received by the Federal agency . . . later than 10 days before the opening of bids shall not be effective except when the Federal agency . . . finds that there is a reasonable time in which to notify bidders of the modification.

16. *Id.*

17. 29 C.F.R. § 5.12 (1979) provides in part:
   All questions arising in any agency relating to the application and interpretation of the rules contained in this part and in Parts 1 and 3 of this subtitle . . . shall be referred to the Secretary [of Labor] for appropriate ruling or interpretation. The rulings and interpretations shall be authoritative and those under the Davis-Bacon Act may be relied upon as provided for in section 10 of the Portal-to-Portal Act of 1947 (29 U.S.C. 259). Regulations governing general and project wage determinations are contained in Part 1, "Procedures for Predetermination of Wage Rates," of the subtitle.

18. *Id.*

19. 29 C.F.R. § 7.1(d) (1979).

20. 29 C.F.R. § 7.1(b) (1979) provides:
   The Board has jurisdiction to hear and decide in its discretion appeals concerning questions of law and fact from final decisions under Parts 1, 3, and 5 of this subtitle including decisions as to the following: (1) Wage determinations issued under the Davis-Bacon Act and its related minimum wage statutes; (2) debarment cases arising under Part 5 of this subtitle; (3) controversies concerning the payment of prevailing wage rates or proper classifications which involve significant sums of money, large groups of employees, or novel or unusual situations; and (4) recommendations of a Federal agency for appropriate adjustment of liquidated damages which are assessed under the Contract Work Hours and Safety Standards Act.

21. 29 C.F.R. § 7.2 (1979). *See Associated Builders & Contractors v. United States Dep't of Energy*, 451 F.Supp. 281 (S.D.Tex.1978).

the Board by "[a]ny party or aggrieved person." [22]

The Wage Appeals Board operates as an appellate agency and does not hear matters *de novo* except on a showing of extraordinary circumstances.[23] The Board's decision is based on the record submitted and such oral argument as may be permitted.[24] The regulations do not provide for appeals of the Board's decisions. Reviewability in federal court under the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706, is addressed later in this opinion.[25]

## FACTS

Planning by the City of Atlanta for construction of a new Central Passenger Terminal Complex at the Hartsfield-Atlanta International Airport had been underway for a substantial period of time when the events in controversy began to unfold in October 1976. Four construction contracts were to be awarded: T–1, for the terminal building and four concourse buildings; M–1, for the spine and quarter-point enclosures of underground passageways; M–2, for aprons around the concourses and related paving, grading and drainage; and M–3, for temporary access roads and security fences. The wage rate determination for T–1 is not involved in this case; those for the remaining three contracts are at issue.

General wage determinations for the Atlanta area had been issued for "building," "residential," and "highway" projects. Wage rates were highest in the "building" category and lowest in the "highway" category.[26] Although no general determination for "heavy" rates had been issued, those rates would generally be higher than "highway" rates and lower than "building" and "residential" rates.

In late October or early November 1976, the Federal Aviation Administration (FAA), as contracting agency, concluded that "highway" rates were appropriate for contracts M–2 and M–3, and furnished the pertinent general wage determination from the Federal Register to the City of Atlanta for inclusion in its bid specifications. The Department of Labor did not participate in the determination of the applicable category.

The wage determination for contract M–1, however, was approached quite differently. On November 19, 1976, the FAA applied to the Regional Administrator of the Department of Labor's Wage and Hour Division for a project wage determination for contract M–1. The FAA had concluded that the M–1 construction would be classified as "heavy," and therefore requested rates which were unavailable from the general determinations for the Atlanta area.

The regional office of the Wage and Hour Division responded by referring the FAA to the higher "building" rates, published in the Federal Register, thus rejecting the suggestion that "heavy" rates should apply. The FAA thereupon resubmitted its request for a project determination, providing a different description of the M–1 construction. After consultation with both the FAA and the national office of the Wage and Hour Division, the regional office issued a project determination specifying "heavy" rates for contract M–1 on December 22, 1976.

Thus, with the FAA's decision that "highway" rates, available in the Federal Register as a general determination, applied to contracts M–2 and M–3, and the Department of Labor's project determination applying "heavy" rates to contract M–1 and concomitantly setting those rates for the project, the City of Atlanta was prepared to proceed with the opening of bids on January 21, 1977, utilizing a "heavy" rate project determination for the first contract and "highway" rates from the Atlanta general determination for the other two.

**22.** 29 C.F.R. § 7.9(a) (1979).

**23.** 29 C.F.R. § 7.1(e) (1979).

**24.** 29 C.F.R. § 7.14(b) (1979).

**25.** See text accompanying notes 30 to 37, *infra.*

**26.** *See North Ga. Bldg. & Const. Trades Council v. United States Dep't of Transp.,* 399 F.Supp. at 59 n.1.

Before the bid opening date, however, the three wage determinations gained the attention of George Caudelle, business manager for North Georgia. He obtained blueprints and contract specifications and reviewed them with officials of the Wage and Hour Division national office on January 5, 1977. The City presented its views to the Division the following day. A Department of Labor official also discussed Caudelle's objections by telephone with the FAA.

The Department of Labor concluded that because contracts M–1, M–2 and M–3 were auxiliary to the main terminal contract, T–1, "building" rates ought to apply to those contracts as they did to T–1. On January 10, officials of the Department had a lengthy telephone conversation with FAA officials about the impending wage rate changes. The parties dispute whether the FAA was informed in that discussion that a definite decision to change the wage determinations had been reached. A draft version of a telegram advising the FAA of the changes was read over the telephone to FAA officials on January 11. The telegram was dispatched that same day to the FAA, and a copy was sent to the City. Both received the telegram on January 12.

The FAA advised the City that because the modifications had been received later than ten days before the bid opening date of January 21, a determination would have to be made whether there was "a reasonable time in which to notify bidders."[27] The City provided a list of factors weighing against inclusion of the rate changes in the bid specifications. The Department of Labor informed the FAA of its position that "cancellations" rather than "modifications" had occurred, so that the 10-day rule was simply inapplicable and the changes would have to be incorporated in the bid specifications.

Concluding there was not "reasonable time" in which to notify bidders, the FAA

directed on January 18 that bid opening proceed on schedule without changes in wage rate specifications. Bidders were notified by the City that January 21 remained the bid opening date.

North Georgia filed this action in federal district court on January 20, 1977, seeking to enjoin the City from receiving bids or awarding contracts based on the earlier wage determinations and to compel the inclusion of "building" rates, as directed by the Department of Labor, in bid specifications and contracts. The district court initially issued a temporary restraining order to prevent the opening of bids before 7 p. m. on January 21. On that day, the court conducted a hearing and denied North Georgia's motion for a preliminary injunction. Bid opening proceeded on January 21.

The City filed its motion for summary judgment on January 26. In its reply to that motion, North Georgia disclosed it had filed an appeal to the Wage Appeals Board seeking enforcement of the Department of Labor's wage rate determinations. The Board held an adversary hearing on February 24.

In its written decision, the Wage Appeals Board adopted a position which had not previously been argued to the district court by any party.[28] The Board concluded that, since the City had neither applied for nor received any financial assistance from the FAA at the time it received bids on the disputed contracts, the Davis-Bacon Act and the regulations promulgated thereunder were inapplicable to the controversy. The Department of Labor's telegram of January 11, though "merely advisory" at the time of its dispatch, stated the wage rates which would be required once the Davis-Bacon Act became applicable, assuming no further change in wage determinations before that time. The Board noted that the City had filed a "preapplication"

27. 29 C.F.R. §§ 1.7(b)(1) and (2). *See* footnotes 13 and 15.

28. *The Prevailing Wage Rates Applicable to the Construction of the Hartsfield International Airport Underground Connector (M–1), Aprons (M–2), and Temporary Access Roads and Fencing (M–3)*, WAB Case No. 77–4 (February 25, 1977).

for federal assistance on February 24, and that assistance could only be granted if contract wage rates complied with those specified by the Department of Labor.[29]

The decision of the Wage Appeals Board further complicated the already difficult case before the district court. On February 28, North Georgia renewed its motion for a preliminary injunction against the signing of contracts with allegedly improper wage rates. The district court's order of March 15 again denied that motion and granted the City's motion for summary judgment.

The district court's order held that (1) the Davis-Bacon Act and regulations were applicable to the challenged wage determinations notwithstanding the City's failure to apply for federal funding until later; (2) the district court was not bound to follow the Wage Appeals Board decision insofar as it "renders uncertain and capricious the procedures and regulations designed to implement the Davis-Bacon Act"; (3) the Department of Labor's telegram effected "modifications" of wage rates later than 10 days prior to the opening of bids, so that notification of bidders would be governed by 29 C.F.R. § 1.7(b)(1); and (4) the FAA acted reasonably, not arbitrarily or capriciously, in concluding that insufficient time remained to notify bidders of the modifications. These legal issues are before this Court on appeal.

## REVIEWABILITY OF WAGE APPEALS BOARD DECISION

North Georgia contends the decision of the Wage Appeals Board was not reviewable by the district court under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706. We need not decide whether the correctness of the Department of Labor's wage determinations, affirmed by the Wage Appeals Board decision,[30] is subject to judicial review.[31] The district court expressly declined to review the correctness of the wage determinations, as do we.

The district court's review focused instead on the Board's conclusion that the Davis-Bacon Act was not effective before an application for federal assistance was received by the contracting agency. The Administrative Procedure Act permits judicial review unless "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."[32]

Under the Act, a statute is deemed to restrict access to judicial review "only upon a showing of 'clear and convincing evidence' of . . . legislative intent."[33] The Davis-Bacon Act does not expressly preclude judicial review. Those portions of the legislative history which suggest a preclusion of review are addressed to review of wage determinations, not of agency decisions as to the coverage of the Davis-Bacon Act.[34] We conclude that judi-

---

**29.** *See* 14 C.F.R. § 152.23(a) (1977).

**30.** The decision stated:
[I]t is presumed that the decision of the Assistant Administrator [of the Wage and Hour Division] is valid since it was made on the basis of an analysis of the information submitted by the North Georgia Building and Construction Trades Council and the City of Atlanta. Sufficient evidence was not presented at the hearing to show that the analysis and the subsequent decision of the Assistant Administrator were incorrect.
*The Prevailing Wage Rates Applicable to the Construction of the Hartsfield International Airport*, WAB Case No. 77–4 at 1 (February 25, 1977).

**31.** *See, e. g., United States v. Binghamton Constr. Co.*, 347 U.S. at 177, 74 S.Ct. at 441; *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 425 n.1, 86 S.Ct. 1539, 1540, 16 L.Ed.2d 662 (1966); *Burnett Constr. Co. v. United States*, 413 F.2d 563, 566 (Ct.Cl.1969); *Nello L. Teer Co. v. United States*, 348 F.2d at 539, 172 Ct.Cl. 255. *But see id.* at 540–542, 172 Ct.Cl. 255 (Whitaker, J., dissenting).

**32.** 5 U.S.C.A. § 701(a).

**33.** *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), *quoting Rusk v. Cort*, 369 U.S. 367, 380, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962).

**34.** *E. g.,* S.Rep. No. 963, 88th Cong., 2d Sess. ——, *reprinted in* [1964] U.S.Code Cong. & Admin.News, pp. 2339, 2342–43; General Subcomm. on Labor of the House Comm. on Education and Labor, 88th Cong., 1st Sess., Report on the Administration of the Davis-Bacon Act 15 (Comm. Print 1963).

cial review of the Wage Appeals Board's decision as to the applicability of the Davis-Bacon Act is not precluded by that Act.[35]

Nor is the Wage Appeals Board's decision "committed to agency discretion by law." This "very narrow" exception to judicial review will be applied only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"[36] The Davis-Bacon Act is not so broadly drawn as to commit the issue of its coverage to agency discretion.[37] We conclude that the Wage Appeals Board decision as to the applicability of the Davis-Bacon Act is reviewable in accordance with the standards of the Administrative Procedure Act.

## APPLICABILITY OF THE DAVIS–BACON ACT

The Davis-Bacon Act is applicable to federally-assisted airport projects under § 1722(b) of the Airport and Airway Development Act, which provides:

> All contracts in excess of $2,000 for work on projects for airport development *approved under this subchapter* which involve labor shall contain provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended, which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work. [Emphasis supplied]

On January 21, 1977, when the City received bids on contracts M–1, M–2 and M–3, no application for federal assistance to the project had been submitted to the FAA. The City submitted a "preapplication" for federal assistance on February 23, 1977.

Counsel for the Department of Labor stated at oral argument that funding was not approved until about May 20, 1977.

North Georgia asserts the Wage Appeals Board correctly decided that the Davis-Bacon Act did not apply to the airport project at the times the disputed wage determinations were made and the City received bids on the project. If the Act did not apply, then the 10-day rules of 29 C.F.R. § 1.7(b) were also inapplicable. Moreover, the City's receipt of bids based on wage determinations disapproved by the Department of Labor, though permissible at the time of receipt because unaffected by the Davis-Bacon Act, would be subject to challenge once an application for federal assistance brought the Act into play.

■ In reviewing the decision of the Wage Appeals Board, this Court is "under no obligation to defer to [its] legal conclusions."[38] Under the Administrative Procedure Act, "[q]uestions of law, unlike questions of fact, are freely reviewable by the courts."[39] We conclude the Wage Appeals Board erred in its legal determination that the Davis-Bacon Act did not apply to the events disputed in this case.

Realistically there had been federal participation in the airport project at least since the onset of events leading to this controversy. The FAA made the initial selection of "highway" rates from the Atlanta general determinations for contracts M–2 and M–3, and requested and received a project determination from the Department of Labor for contract M–1. The FAA was apparently familiar with the construction projects planned and shared the City of Atlanta's anticipation that federal assistance would be forthcoming. As a practical matter, everyone involved knew that federal funds would be required to complete

---

**35.** *Accord, Virginia ex rel. Comm'r, Va. Dep't of Highways & Transp. v. Marshall,* 599 F.2d at 592.

**36.** *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971), *quoting* S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).

**37.** *See Virginia ex rel. Comm'r, Va. Dep't of Highways & Transp. v. Marshall,* 599 F.2d at 592.

**38.** *Coca-Cola Co. v. Atchison, Top., & S. F. Ry. Co.,* 608 F.2d 213, 218 (5th Cir. 1979).

**39.** *Id.*

these airport projects, and acted accordingly.

█ The City of Atlanta consistently sought to comply with Davis-Bacon Act procedures under the guidance of its contracting agency, the FAA, in anticipation of an application for and grant of federal assistance. At no time prior to the Wage Appeals Board decision did the Department of Labor suggest that the Davis-Bacon Act did not apply. Having recognized the reality of ongoing federal participation in project planning and having attempted to comply with the regulations, the City should not be denied the protections and regularity afforded by Davis-Bacon Act procedures.

█ Section 1722(b) of the Airport and Airway Development Act requires compliance with the Davis-Bacon Act in bidding and contracting for airport projects approved for federal assistance under that program. That provision does not, however, preclude reliance on Davis-Bacon Act procedures in the formulation of bid specifications containing appropriate wage rates for projects, in the anticipation that federal assistance will subsequently be sought.

North Georgia incorrectly relies on *City of Boston v. Volpe*, 464 F.2d 254 (1st Cir. 1972). The City of Boston sought a preliminary injunction against construction by the Massachusetts Port Authority of an airport taxiway, contending primarily that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. §§ 4321–4361, was violated by the allocation of federal funds for the project without preparation of an environmental impact statement.

Affirming the district court's denial of a preliminary injunction, the court of appeals held that the FAA's tentative budgetary allocation of federal funds for the project, followed by a formal application for federal assistance, did not so "federalize" the project as to require the imposition of

NEPA standards. The court asserted that "the adoption of certain federal standards and specifications in the hope of qualifying for federal assistance cannot transform a state or local project into a federal one." [40]

We need not decide whether we would agree with the First Circuit's holding in *City of Boston v. Volpe* if presented with the precise circumstances of that case, because the matter before this Court is significantly different.

We first note that the court in *City of Boston v. Volpe* was reviewing the district court's denial of preliminary injunctive relief, primarily a determination that the plaintiff had failed to show a substantial likelihood of success on the merits of its claim.[41] That denial was reversible only if the district court had abused its discretion, and the court of appeals indicated the limited scope of its review.[42] The present case is before this Court after the grant of a motion for summary judgment and thus requires a decision on the merits of the issues of law raised.

More importantly, *City of Boston v. Volpe* involved the plaintiff's effort to impose federal standards upon a state agency unwilling to comply with them until required to by statute. The City of Atlanta, on the other hand, realistically attempted to comply with Davis-Bacon Act procedures, and must be extended the protections they afford.

We hold that the Wage Appeals Board erred in deciding that the Davis-Bacon Act and its regulations did not apply to this dispute. Resolution of the controversy thus depends on whether the wage rates included in the City's bid specifications were determined in accordance with Davis-Bacon Act procedures.

## APPLICATION OF THE 10–DAY RULES

We must decide whether the FAA improperly refused to incorporate into bid

---

40. 464 F.2d at 258.

41. *Pauls v. Secretary of Air Force*, 457 F.2d 294, 298 (1st Cir. 1972); *see City of Boston v. Volpe*, 464 F.2d at 260.

42. *Essex County Preservation Ass'n v. Campbell*, 536 F.2d 956, 962 (1st Cir. 1976); *see City of Boston v. Volpe*, 464 F.2d at 259.

specifications and contracts the wage determination changes proposed by the Department of Labor. There are three sequential issues: (1) Were the proposed changes "modifications" within the scope of 29 C.F.R. §§ 1.7(b)(1) or (2), which restrict the effectiveness of modifications received later than 10 days before the opening of bids? (2) If so, were the modifications "received" by the FAA prior to or during that 10-day period? (3) If "modifications" were "received" during that period, did the FAA act arbitrarily or capriciously in concluding there was insufficient time to notify bidders of the modifications?

Differences in the types of wage determinations involved must be recognized in this analysis, because the applicable regulations differ for project and general determinations. We therefore treat contract M-1 separately from contracts M-2 and M-3. Bid specifications for contract M-1 were based on a *project* wage determination prepared by the Department of Labor at the request of the FAA. The Department of Labor initially formulated a set of "heavy" rates for contract M-1.

Bid specifications for contracts M-2 and M-3, on the other hand, were based on the *general* wage determination for "highway" construction in the Atlanta area, as published in the Federal Register. The FAA determined that "highway" rates were appropriate, and the Department of Labor did not review that determination until objections were raised by North Georgia.

■ Our analysis of Davis-Bacon Act regulations is tempered by two guidelines. An administrative agency's interpretation of its own regulations must be accorded substantial deference.[43] Despite such breadth of interpretation, however, the agency is bound to comply with the regulations it promulgates.[44]

---

**43.** *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Expedient Services, Inc. v. Weaver*, 614 F.2d 56, 57 n.1 (5th Cir. 1980).

**44.** *See United States v. Nixon*, 418 U.S. 683, 696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974).

---

*Contract M-1*

Once issued by the Department of Labor on December 22, 1976, the project determination for contract M-1 was effective for 120 days.[45] Under 29 C.F.R. § 1.7(b)(1),

> All actions modifying an original project wage determination prior to the award of the contract or contracts for which the determination was sought shall be applicable thereto, but modifications received by the Federal agency . . . later than 10 days before the opening of bids shall not be effective except when the Federal agency . . . finds that there is a reasonable time in which to notify bidders of the modification.

The Department of Labor, which promulgated § 1.7(b)(1), insists that its decision to apply published "building" rates instead of its earlier project determination to contract M-1 effected a "cancellation" rather than a "modification" of that determination.[46] The term "modification," the Department argues, encompasses only incremental changes in the scale of wage rates within a project determination. A "cancellation," on the other hand, becomes necessary when a gross error is detected in the overall project determination, requiring a more complete change in wage rates. The timing of such a "cancellation," the argument concludes, is not governed by § 1.7(b)(1) or any other regulation.

■ We reject this interpretation, and hold that the Department of Labor's effort to change its project wage determination for contract M-1 was a "modification" subject to the 10-day rule of 29 C.F.R. § 1.7(b)(1).

The very purpose of § 1.7(b) is to stabilize wage determinations for a reasonable peri-

---

**45.** 29 C.F.R. § 1.7(a)(1). *See* footnote 12.

**46.** The term "cancellation," though proposed in the Department of Labor's brief, is not used in the relevant regulations.

od of time prior to the opening of bids.[47] To permit the Department of Labor to change a project determination during that intended period of stability without complying with the requirements of the regulation would undermine that purpose.

Moreover, the language of § 1.7(b)(1) suggests broad coverage rather than the narrow scope for which the Department of Labor contends. The regulation begins, "All actions modifying . . .", thereby indicating that the subsequent word "modifications" encompasses all variety of changes instead of merely incremental adjustments to wage rates within a particular project determination.

■ Having concluded that the modifications to contract M–1 directed by the Department of Labor are within the coverage of § 1.7(b)(1), we must now decide whether those modifications were "received" by the FAA "later than 10 days before the opening of bids." [48] Assuming without deciding that the FAA was notified by telephone prior to the onset of the 10-day period that a definite decision to change the wage determination for M–1 had been made,[49] we nevertheless decide the modifications were not "received" by the FAA for purposes of the regulation until the agency's receipt of the Department of Labor's telegram on January 12, later than 10 days before the January 21 bid opening date.

We base our decision primarily on the language of the regulation itself. Section 1.7(b)(1) refers to "modifications received by the Federal agency." That choice of terminology clearly connotes physical possession of directions specifying the modifications to be made rather than telephone notice of those changes.

The circumstances of this case illustrate the underlying rationale for basing the application of the 10-day rule on receipt of modifications rather than telephone notice. The parties agree that changes in the project determination for contract M–1 were discussed by telephone on January 10, but there is an apparent dispute in the record over the specific content of that conversation. It would be hazardous at best for a federal agency to direct changes in the bid specifications for a major construction project on the basis of such a telephone call. Basing the 10-day rule on receipt of modifications encourages the more reliable use of written communications. Moreover, this approach provides a more definite and useful guideline for the application of § 1.7(b)(1).

■ Modifications received by the contracting agency later than 10 days before the opening of bids are ineffective except when that agency "finds that there is a reasonable time in which to notify bidders of the modification." [50] The remaining issue as to contract M–1 is whether the FAA correctly found there was insufficient time to notify bidders of the modifications received.

The Department of Labor's telegram was received on January 12 by the FAA, which promptly requested the City's assistance in determining whether bidders could be notified. The City responded by letter the following day with a list of factors impeding successful notifications. The FAA informed the City on January 18 of its finding of insufficient time, and bidding occurred on January 21.

The FAA based its finding on several factors. About 175 sets of specifications had been distributed nationwide to prime contractors, subcontractors and material

---

**47.** Proposed Amendments to the Davis-Bacon Act: Hearings on H.R. 7075 Before the General Subcomm. on Labor of the House Comm. on Education and Labor, 88th Cong., 1st Sess. 41 (1963) (statement of Charles Donahue, Solicitor of Labor).

**48.** 29 C.F.R. § 1.7(b)(1). *See* footnote 15.

**49.** By deciding this issue of law on the assumption that telephone notice of a definite decision was rendered by the Department of Labor, we moot the question whether the contents of that telephone conversation present a disputed issue of material fact making this case inappropriate for summary judgment.

**50.** 29 C.F.R. § 1.7(b)(1). *See* footnote 15.

suppliers, some of which were expected to bid on as many as four contracts. There was concern that small and minority businesses in particular would encounter difficulty in changing their bids and adjusting bid bonding and insurance arrangements in a short period of time. In general, the FAA anticipated that across-the-board changes in wage rates for three contracts would have the effect of reducing competition because of the inability of some bidders to make timely adjustments.

North Georgia relies on *Operating Engineers, Local 627 v. Arthurs*, 355 F.Supp. 7 (W.D.Okla.), aff'd, 480 F.2d 603 (10th Cir. 1973), in which the court found that the Bureau of Reclamation had arbitrarily and capriciously rejected a wage modification received less than 10 days before the opening of bids. The agency in that case "expressed the opinion that it had the absolute discretion to accept or reject a wage modification" so received, and apparently offered no credible explanation for rejecting the modification.[51] The court of appeals noted the Bureau's "stunning disregard of the [Davis-Bacon] Act's mandates." [52] *Arthurs* is thus factually distinguishable from this case, in which the FAA began promptly after receiving the modifications to solicit information from which to draw its conclusion as to the sufficiency of time.

The FAA did not err in weighing factors other than its ability to *notify* bidders. Section 1.7(b)(1) impliedly involves the feasibility both of informing bidders of the modifications and of having those changes accurately incorporated into timely bid submissions. Convenience, accuracy and timeliness are appropriate considerations even though laborers on the project are intended to be the ultimate beneficiaries of the Davis-Bacon Act.

The fact the original project wage determination for contract M–1 was not transmitted to bidders until January 11 does not

render the FAA's subsequent decision as to the sufficiency of time arbitrary or capricious. In view of the greater burdens of notification and recalculation involved in modifications to wage determinations for three contracts, which the FAA believed necessary, and the period of time available, the FAA's finding was neither arbitrary, capricious, nor an abuse of discretion.[53] The proposed modifications to contract M–1 were ineffective under § 1.7(b)(1).

### Contracts M–2 and M–3

A different problem of interpretation arises with respect to the Department of Labor's direction that "building" rates, published in the Federal Register as a general determination, be used in contracts M–2 and M–3 instead of the "highway" rates, similarly published, which the FAA had decided to apply. Until North Georgia raised an objection to the FAA's decision, the Department of Labor had neither determined nor reviewed the rates applicable to these contracts.

The district court clearly erred in treating the Department of Labor's action as a modification subject to the 10-day rule of 29 C.F.R. § 1.7(b)(1). That regulation, discussed *supra* in connection with contract M–1, applies to "actions modifying an original project wage determination." No project determination was ever made with regard to contracts M–2 and M–3.

The City contends the Department's actions were instead modifications governed by 29 C.F.R. § 1.7(b)(2), which provides:

All actions modifying a general wage determination shall be applicable thereto, but modifications published in the *Federal Register* later than 10 days before the opening of bids shall not be effective, except when the Federal agency . . . finds that there is a reasonable time in

---

**51.** 355 F.Supp. at 16.

**52.** 480 F.2d at 604.

**53.** 5 U.S.C.A. § 706 directs a reviewing court to

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

which to notify bidders of the modification.

We reject the City's interpretation. A general wage determination is a published schedule of wage rates applicable to the various project categories in a particular locality.[54] The "modifications published in the *Federal Register*" to which the 10-day rule of § 1.7(b)(2) applies are clearly those published "on a timely basis" to keep general wage determinations current with prevailing local wages.[55]

The actions of the Department of Labor did not update an earlier published general determination. Instead, for the first time, the Department of Labor considered the *category* of general determination applicable to contracts M–2 and M–3, reviewing the FAA's decision to apply "highway" rates to those projects. The Department of Labor's determination that "building" rather than "highway" rates should be incorporated in the bid specifications for contracts M–2 and M–3 was therefore not a modification of a general wage determination subject to the 10-day rule of § 1.7(b)(2).

The Department of Labor's determination of the category of wage rates applicable to contracts M–2 and M–3 must therefore be analyzed differently than its issuance of modifications to the project determination for contract M–1. Once the applicable 10-day rule came into play, control over the effectiveness of modifications to the project determination for contract M–1 passed from the Department of Labor to the contracting agency, the FAA. Neither 10-day rule applies, however, to the Department of Labor's initial determination that "building" rates should apply to contracts M–2 and M–3. We must further examine the regulations to determine whether bid opening should have proceeded without the incorporation of "building" rates in the specifications for contracts M–2 and M–3.

This issue was addressed by Chief District Judge Edenfield in *North Georgia Building & Construction Trades Council v. United States Department of Transportation*, 399 F.Supp. 58 (N.D.Ga.1975), a case involving facts strikingly similar to those presented here. Plaintiff North Georgia objected to the Department of Transportation's inclusion of "highway" rates from the general determination for Atlanta in bid specifications for construction of a bus facility by the Metropolitan Atlanta Rapid Transit Authority (MARTA). After being apprised of the controversy, the Department of Labor agreed with North Georgia that higher "building" rates should apply, and so notified the Department of Transportation and MARTA.

Bid opening proceeded as scheduled, however, with no change in specifications to reflect the higher rates, and North Georgia soon thereafter brought suit to enjoin the execution of contracts resulting from the bidding. The district court granted the relief requested, permitting only the execution of contracts with a clause providing that wage scales therein were subject to adjustment on order of the Secretary of Labor or the Wage Appeals Board.

The district court based its decision on 29 C.F.R. § 5.12, which establishes a procedure for the submission of wage determination disputes to the Secretary of Labor, providing in part:

> All questions arising in any agency relating to the application and interpretation of the rules contained in this part and in Parts 1 and 3 of this subtitle, and of the labor standards provisions of any of the statutes listed in § 5.1 shall be referred to the Secretary for appropriate ruling or interpretation.

Finding the regulation applicable to the controversy before it, the district court held that once North Georgia raised an objection to the Department of Transportation's selection of a wage rate, that controversy had to be submitted to the Secretary of Labor for interpretation or a ruling. In addition to enjoining execution of the contracts, the court ordered such a submission.

---

**54.** *See* 29 C.F.R. §§ 1.5(b), 1.6 (1979).

**55.** 29 C.F.R. § 1.7(a)(2). *See* footnote 9.

■ Section 5.12 is similarly applicable to the controversy presently before this Court. Regulations governing the determination of wage rates are contained in Part 1 of the subtitle, and the Airport and Airway Development Act, incorporated by reference in 29 C.F.R. § 5.1 (1976), was subsequently listed therein. The question raised by North Georgia in its January 5, 1977 presentation to the national office of the Wage and Hour Division clearly related to the application of wage determination regulations and the labor standards provisions of the Airport and Airway Development Act.

Applying § 5.12, we therefore hold that once the FAA was notified of North Georgia's objections to its selections of general determination categories for contracts M–2 and M–3, bid opening could not proceed until the Secretary had resolved the dispute. North Georgia's presentation of blueprints and contract specifications occurred on January 5. The FAA was indisputably aware of the controversy by the following day, when contacted by telephone. The Department of Labor stated its position in a telegram received by the FAA on January 12. Bid opening should not have proceeded on January 21 as to contracts M–2 and M–3.

■ Again, the distinction between contract M–1 and contracts M–2 and M–3 must be underscored. Section 5.12, requiring the submission of questions to the Secretary of Labor, does not act to stay the onset of the 10-day rule of § 1.7(b)(1). Once the 10-day rule became effective as to contract M–1, the ultimate determination of whether modifications would be effective passed from the Department of Labor to the FAA. Prior to 10 days before the opening of bids, the Department of Labor could clearly modify its earlier project determination. Within 10 days of the bid opening, however, the FAA had to decide the timeliness of modifications submitted by the· Department of

Labor. Because no 10-day rule applied to contracts M–2 and M–3, jurisdiction remained with the Department of Labor and the controversy had to be resolved prior to the opening of bids.

We need not decide if North Georgia's presentation of blueprints and contract specifications was itself a referral to the Secretary for purposes of § 5.12, or the corollary issue of whether the January 11 telegram, signed by the Assistant Administrator of the Wage and Hour Division, was effectively an "authoritative" ruling of the Secretary under § 5.12. On remand, the district court, receiving additional evidence as necessary, should decide whether a more formal submission of the issue is required to determine the Secretary's final decision as to the appropriate wage rates.

■ The district court should ensure that any party aggrieved by the Secretary's ruling is afforded an opportunity to appeal the merits of that decision to the Wage Appeals Board. Although the Board's decision of February 25, 1977 briefly addressed the merits of the Department of Labor's determination of wage categories,[56] the matter was not properly before the Board. North Georgia purported to petition for review, but was not entitled to do so under the regulations. Under 29 C.F.R. § 7.2(a), petitions for review of wage determinations may be filed by

[a]ny interested person who is seeking a modification or other change in a wage determination under Part 1 of this subtitle and who has requested the administrative officer authorized to make such modification or othei change under Part 1 and the request has been denied . .

North Georgia could not have properly petitioned for a "modification or other change" in wage determinations of the Department of Labor which it supported.[57] Any party

---

56. *See* footnote 30.

57. While we disagree with the Wage Appeals Board's decision as to the applicability of the Davis-Bacon Act, we recognize that North Georgia's petition for a review of the *effect* of the Department of Labor's January 11 telegram

was properly before the Board. In the exercise of its jurisdiction over "controversies concerning the payment of prevailing wage rates or proper classifications which involve significant sums of money, large groups of employees, or

aggrieved by the Secretary's determination on remand may appeal that decision afresh to the Wage Appeals Board.

If the wage determinations which emerge from this process differ from those incorporated into contracts M–2 and M–3, the district court must then fashion appropriate relief. It is too late, of course, to require inclusion in those contracts of clauses permitting adjustment of wage rates on order of the Secretary or the Wage Appeals Board. Because those contracts are not in the record before this Court, we cannot determine whether they contain adjustment clauses which would incorporate the modified wage rates if required by the Secretary or the Wage Appeals Board.[58]

The district court must fashion a remedy which equitably recognizes the entitlement of workers under contracts M–2 and M–3 to properly determined wage rates under the Davis-Bacon Act.

The district court's grant of summary judgment and denial of a preliminary injunction as to contract M–1 is affirmed. As to contracts M–2 and M–3, the judgment is reversed and the district court is ordered to grant relief consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

novel or unusual situations," 29 C.F.R. § 7.1(b)(3), as distinct from its jurisdiction over the wage determinations themselves, the Board may entertain the petition of

> [a]ny party or aggrieved person . . . [filed] within a reasonable time from any final decision in any agency action under Part 1, 3, or 5 of this subtitle.

29 C.F.R. § 7.9(a). In this case, the "final decision" appealed from was the FAA's deci-sion not to incorporate in its specifications the wage categories indicated in the Department of Labor's telegram.

**58.** *See North Ga. Bldg. & Constr. Trades Council v. U. S. Dep't of Transp.*, 399 F.Supp. at 63–64 (permitting bidding before the Secretary's final § 5.12 wage determination if the contracts contained an appropriate adjustment clause).