# Reconsideration of Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities

Contrary to the view expressed in an earlier opinion of the Office of Legal Counsel, the plain language of the Davis-Bacon Act does not bar its application to a lease contract on the ground that such contracts are *per se* not contracts for construction. The applicability of the Davis-Bacon Act to any specific lease contract can be determined only by considering the details of the particular contract.

May 23, 1994

MEMORANDUM OPINION FOR THE SOLICITOR
DEPARTMENT OF LABOR
AND
THE GENERAL COUNSEL
DEPARTMENT OF VETERANS AFFAIRS

At the request of the Attorney General, we have reviewed the principles and reasoning of a 1988 Office of Legal Counsel opinion concluding that the Davis-Bacon Act did not cover a contract entered into by the Veterans Administration (now Department of Veterans Affairs) ("VA") for the long-term lease and construction of a building to be used as an outpatient clinic. *Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities*, 12 Op. O.L.C. 89 (1988) ("1988 O.L.C. Opinion," or "1988 Opinion"). We have concluded that the 1988 Opinion erred in concluding that the plain language of the Davis-Bacon Act bars its application to any lease contract, whether or not the lease contract also calls for construction of a public work or public building. We believe that the applicability of the Davis-Bacon Act to any specific lease contract can be determined only by considering the facts of the particular contract.

## I.

The 1988 O.L.C. opinion arose out of a dispute between the VA and the Department of Labor. The VA had entered into a contract (the "Crown Point contract") with a developer for the long-term lease of space for use as a VA health clinic, in a building that the developer would build to house the clinic. *In re Applicability of Davis-Bacon Act to Lease of Space for Outpatient Clinic, Crown Point, Indiana*, WAB Case No. 86-33, 1987 WL 247049, at 2 (W.A.B. June 26, 1987) ("1987 WAB Opinion"). The dispute concerned whether the contract was covered by the Davis-Bacon Act. That Act applies to

> every contract in excess of $2,000 to which the United States or the
> District of Columbia is a party, for construction, alteration, and/or

> repair, including painting and decorating, of public buildings or
> public works . . . .

40 U.S.C. § 276a(a). The Act provides that such contracts shall include provisions that mechanics and laborers employed on these projects be paid prevailing wages to be determined by the Secretary of Labor. *Id.* Although the Crown Point contract called for the lease of clinic space, it also included numerous provisions requiring that the building be constructed according to VA specifications, on a VA timetable, and subject to VA inspection. 1987 WAB Opinion at 4-5. Nonetheless, the VA had concluded that the Act did not apply to the Crown Point agreement because it was a lease and, in the VA's view, a lease is not a "contract . . . for construction" under the Act. Therefore, the contract contained no provisions mandating compliance with the prevailing wage requirements of the Davis-Bacon Act.

Upon learning of VA's plans, the Building and Construction Trades Department of the AFL-CIO requested a ruling from the Wage and Hour Administrator of the Department of Labor that the construction of the building was covered by the Davis-Bacon Act. The Administrator, applying the Wage Appeals Board's ("WAB") analysis in a similar case, agreed that the contract should have included Davis-Bacon prevailing wage provisions. *See* 1987 WAB Opinion at 1-2 (noting Administrator's reliance on *In re Military Housing, Ft. Drum*, WAB Case No. 85-16 (Aug. 23, 1985)). The VA appealed to the WAB, which upheld the Administrator's action. *Id.*

However, the VA continued to resist the Department of Labor's interpretation of the Act. While the AFL-CIO sought a court judgment to compel the VA to comply with the WAB's decision, the VA sought an opinion from the Attorney General that the WAB had misread the law. The result was a court determination that the WAB decision was a reasonable interpretation of ambiguous language in the Act under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *Building and Constr. Trades Dep't, AFL-CIO v. Turnage*, 705 F. Supp. 5 (D.D.C. 1988), and an O.L.C. ruling that the WAB decision conflicted with the plain language of the Act (the 1988 Opinion). The Department of Justice did not appeal the *Turnage* case because of the confused procedural posture it presented, but instructed Labor to comply with the reasoning of the 1988 O.L.C. opinion in future cases. Letter for Jerry G. Thorn, Acting Solicitor, Department of Labor, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel (Jan. 23, 1989).

You have asked that we review our ruling in the 1988 Opinion that the plain language and legislative history of the Davis-Bacon Act indicate that the Act does not extend to leases. We have reviewed the prior opinion, solicited the views of affected executive departments, and conducted a thorough review of the legislative history, case law, and executive, judicial, and congressional interpretations of the Act. We have concluded that the portion of the 1988 Opinion that addressed the

meaning of the Davis-Bacon Act was incorrect. We do not, however, address the question whether the particular contract at issue in that case was a contract for construction of a public work within the meaning of the Davis-Bacon Act, because the decision not to appeal the ruling in the *Turnage* case has mooted the point. Nevertheless, we can say that the fact that a contract is a lease is not the sole determinative factor in deciding whether that contract is also a contract for construction within the meaning of the Davis-Bacon Act.

## II.

The 1988 OLC Opinion concluded that a lease-construction contract for a Veterans Administration outpatient clinic was not a contract for construction of a public building or public work within the meaning of the Davis-Bacon Act, because the plain meaning of the term "contract . . . for construction" could not be read to include a lease, even one that contemplated, and resulted in, the construction of a building for long-term public use.

We do not think the question is so simple. The words "contract . . . for construction . . . of public buildings or public works" do not plainly and precisely indicate that a contract must include provisions dealing only with construction. Rather, the plain language would seem to require only that there be a contract, and that one of the things required by that contract be construction of a public work. This interpretation of the Act is supported not only by its language, but also by the legislative history, by reference to the goals of the Act, by judicial and executive interpretation of the Act, and by the interpretation of similar language in related Acts.

## A.

Since the 1988 Opinion rested on its reading of the plain language of the Act, we begin by setting forth that language. The Act provides that

> [t]he advertised specifications for every contract in excess of
> $2,000, to which the United States or the District of Columbia is a
> party, for construction, alteration, and/or repair, including painting
> and decorating, of public buildings or public works of the United
> States or the District of Columbia . . . which requires or involves the
> employment of mechanics and/or laborers shall contain a provision
> stating the minimum wages to be paid various classes of laborers
> and mechanics which shall be based upon the wages that will be
> determined by the Secretary of Labor to be prevailing for the corre-
> sponding classes of laborers and mechanics employed on projects of

a character similar to the contract work in the [area where] the work is to be performed . . . .

40 U.S.C. § 276a(a).[1]

The 1988 Opinion concluded that this language "plainly and precisely" limited the Act's coverage to "construction contracts," and thus could not be read to include a lease. 1988 Opinion at 93-94.[2] While this may be true so far as it goes, we do not think the term "construction contract" sheds much light on the meaning of the more elaborate statutory term "contract . . . for construction, alteration, and/or repair, including painting and decorating." In particular, we do not think the term "construction contract," any more than the term "contract . . . for

---

[1] An earlier version of the Act provided for coverage of

every contract in excess of $5,000 in amount, to which the United States or the District of Columbia is a party, which requires or involves the employment of laborers or mechanics in the construction, alteration, and/or repair of any public buildings of the United States.

Davis-Bacon Act, ch. 411, § 1, 46 Stat. 1494, 1494 (1931) *See* Armand J Thieblot, Jr., *Prevailing Wage Legislation. The Davis-Bacon Act, State "Little Davis-Bacon" Acts, the Walsh-Healey Act, and the Service Contract Act* 31 (1986) ("Thieblot")
The Act was revised in 1935 to add coverage of public works and of painting and decorating contracts, to lower the contract threshold from $5,000 to $2,000 (to reflect the relatively small dollar value of painting and decorating contracts), to provide for predetermination of wage rates by the Department of Labor, and to provide for remedies for workers not paid the proper rates on covered contracts *See* S. Rep No. 74-1155 (1935), H R Rep No. 74-1756 (1935); Thieblot at 3, 28, 29 (discussing purpose of Act); *id* at 32-34 (discussing 1935 amendments) There is no suggestion in the legislative history that the switch from "contract . which requires or involves the employment of laborers or mechanics in . construction" to the current language of "contract . . . for construction . . . which requires or involves the employment of mechanics and/or laborers" was intended to have any narrowing effect *See, e.g* , S Rep No. 1155; H R Rep No. 74-1756 The Act was modified again in 1964 to include fringe benefits in the calculation of prevailing wages *See* S Rep. No 88-963 (1964), *reprinted in* 1964 U.S.C C A N 2339; Thieblot at 34.
The 74th Congress — the same one that amended the Davis-Bacon Act to include the language at issue here (Act of Aug. 30, 1935, ch 825, § 1, 49 Stat 1011) — also passed the closely related Miller Act, 40 U S C § 270a (Act of Aug 24, 1935, ch. 642, § 1, 49 Stat. 793). The Miller Act provides that contractors shall furnish bonds on "any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work " The language of the Miller Act is almost identical to that used in the 1935 amendments to the Davis-Bacon Act then being considered, and the Miller Act originally included the same $2,000 threshold as the 1935 Davis-Bacon Act Thieblot at 37 n 40, *Universities Research Ass'n v. Coutu*, 450 U.S 754, 758-59 (1981). *See also* S Rep No. 74-1155, at 4, H.R Rep No 74-1756, at 4, 5 (noting relation between Davis-Bacon amendments and the Heard Act (which the Miller Act replaced))
The nearly identical language of the Miller Act has been applied to construction even of public works that would be privately owned, *see, e g , United States ex rel Noland Co v Irwin*, 316 U S 23 (1942) (construction of Howard University library), and to the relocation of a privately-owned railroad that would be flooded by a federal dam, *Peterson v. United States*, 119 F.2d 145 (6th Cir 1941) These cases focused on whether the construction in question was of a public work; there seems to have been no challenge on the basis that the contracts were not for construction The one difference in language between the Miller and Davis-Bacon Acts — that the Davis-Bacon Act refers to contracts "to which the United States or the District of Columbia is a party," 40 U S C. § 276a(a), while the Miller Act does not, *see* 40 U.S C § 270a(a) — is not significant in this setting, since the United States is undeniably a party to the contract to build and lease the Crown Point facility; the difficulty is in determining what sort of contract that contract is.

[2] The 1988 Opinion does not indicate where the new term "construction contracts" comes from. It is not a technical term drawn from case law interpreting the Davis-Bacon Act, or used elsewhere as a means of explaining what the Act covers or does not cover Rather, it appears to be an improvised shorthand for the more elaborate statutory language. We can see no justification for using a shorthand phrase neither endorsed by Congress nor explained in the case law to buttress a narrow reading of the statutory language

construction," unambiguously excludes a contract for the long-term lease of a building to be constructed to comply with the contract, especially when the contracting agency contemplates the construction of a new building and includes substantial provisions concerning construction in the contract. Even prominent critics of the Act have conceded as much. *See, e.g.,* Thieblot at 39 n.50 ("In some circumstances, privately financed construction may be subject to prevailing wage requirements if, for example, the facilities are specially constructed with the intention of leasing them to government occupants."). To rule otherwise would leave substantial room for agencies to evade the requirements of the Act by contracting for long-term lease rather than outright ownership of public buildings and public works.

The Crown Point lease provides a good illustration of the principle that a lease may look very much like a "contract . . . for construction."[3] According to the 1987 WAB Opinion, the Solicitation for Offer "specifically provides for lease of a building to be 'constructed in accordance with VA specifications.'" *Id.* at 3. The requirements under the Solicitation include "preliminary plans and specifications; other working drawings; issuance of a building permit; completed construction documents; start of construction; completion of principal categories of work; phase completion; and final construction completion;" along with "name and experience of the proposed construction contractor," and "evidence of award of the construction contract within 15 days of award." *Id.* Under the terms of the Solicitation, the winning bidder would be required to submit construction progress reports to the VA and to allow the VA to inspect the site. *Id.* All of these requirements indicate that while the contract was labeled a lease, it called for the construction of a building, at least as one expected means of satisfying the terms of the contract. To say that the contract is not "for construction" ignores what the contract itself says.

In short, to regard all lease-construction contracts as outside the scope of the Davis-Bacon Act is contrary to the plain language of the Act: many such leases are in fact contracts that call for the construction of a public work. The difficulty is in determining whether a particular lease is really a contract for construction of a public building or public work, or just a contract to secure the use of private premises on a temporary basis. "Plain language" is of little use in policing this borderline.

---

[3] There can be no question that a lease is a contract, obliging each party to take certain actions *See* 1 Arthur Linton Corbin, *Corbin on Contracts* §§ 1 2-1 3 (rev ed , Joseph M Perillo, ed , 1993) (defining "legal obligation" and "contract," respectively); *Alaska v. United States,* 16 Cl Ct. 5 (1988) (document need not be labeled a contract to be a contract) The real question is whether such a contract is "for construction."

## B.

The legislative history and the purposes of the Act strongly support this interpretation as well. The Act was passed in 1931, and amended in 1935, to ensure that contractors bidding on public works projects would not lower wages so as to be sure to make the lowest bid; and to permit government agencies, which were required to accept the lowest bids, to employ contractors who paid a "fair" wage rather than those who competed by reducing wage rates. S. Rep. No. 74-1155, (1935); H.R. Rep. No. 74-1756 (1935); S. Rep. No. 71-1445, at 1-2 (1931); H.R. Rep. No. 71-2453, at 1-2 (1931);[4] *see also* 74 Cong. Rec. 6505 (1931) (remarks of Rep. Welch). The sponsor, Representative Bacon, justified the bill by stating that the "Government must not be put in the position of helping to demoralize the local labor market."[5]

The Davis-Bacon Act was passed during the Depression, when federal construction accounted for a large portion of construction overall[6] and workers desperate to take any job could be hired at wages far below those available in the past.[7] The result was a concern that the federal public works program would not achieve its desired effect of assisting local communities in regaining prosperity, but instead would allow contractors — and indeed the government itself — to exploit

---

[4] These reports stated that

The Federal Government has entered upon an extensive public building program . intended [in part] . . to benefit the United States at large through distribution of construction throughout the communities of the country without favoring any particular section

The Federal Government must, under the law, award its contracts to the lowest responsible bidder  This has prevented representatives of the departments involved from requiring successful bidders to pay wages to their employees comparable to the wages paid for similar labor by private industry in the vicinity of the building projects under construction.  [S]ome successful bidders have selfishly imported labor from distant localities and have exploited this labor at wages far below local wage rates

This practice, which the Federal Government is now powerless to stop, has resulted in a very unhealthy situation. Local artisans and mechanics, many of whom are family men . . can not hope to compete with this migratory labor  Not only are local workmen affected, but qualified contractors residing and doing business in the section of the country to which Federal buildings are allocated find it impossible to compete with the outside contractors, who base their estimates for labor upon the low wages they can pay to unattached, migratory workmen . . . .

S Rep. No. 71-1445, at 1-2; H.R. Rep No. 71-2453, at 1-2.

[5] 74 Cong Rec. 6510 (1931). *See also* S. Rep No. 74-1155, at 1-2, H Rep. No. 74-1756, at 1 (both stating that the amendments were needed to make the Act more enforceable, because "unscrupulous contractors have taken advantage of the wide-spread unemployment among the buildings crafts to exploit labor and to deprive employees of the wages to which they were entitled under the law"); S. Rep. No. 88-963, at 1, 2 (1964), *reprinted in* 1964 U S C C.A N 2339, 2340 (reviewing the purposes of the Act), Thieblot at 3, 28, 29, 32-34 (reviewing the purposes of this and related acts and discussing the 1935 amendments).

[6] *See, e.g.,* Thieblot at 29, 29 n.18 (between 1929 and 1933, public construction rose from less than one-quarter to more than one-half of all construction nationwide); S Rep. No. 71-1445, at 1 (1931) (federal government has embarked on new, large-scale public works construction program); H R Rep No. 71-2453, at 1 (1931) (same), 74 Cong. Rec 6511 (1931) (remarks of Rep. Bacon) (same).

[7] *See, e g,* Thieblot at 28 (indicating that average construction wages had fallen to half their pre-Depression rates by 1931); 74 Cong Rec 6510 (1931) (remarks of Rep. Johnson hypothesizing wage reduction from $4 to $2 75 per day)

desperate laborers, in some cases imported from other parts of the country.[8] While Congress was presented with evidence that the loss of jobs to outsiders was rare, *see* 74 Cong. Rec. at 6506 (chart noting origins of workers on public building projects), the evidence before Congress also showed that it did occur. Representative Bacon, for example, who sponsored the bill in the House, saw a contract for a Veterans' Bureau hospital in his district go to an outside contractor who employed laborers from Alabama, "huddled in shacks living under most wretched conditions and being paid wages far below the standard," 74 Cong. Rec. at 6510 (statement of Rep. LaGuardia). Meanwhile, unemployed workers in Representative Bacon's own community apparently remained jobless, unable or unwilling to compete for jobs with those willing to accept the substandard conditions.

This view of the purposes of the Act — that government should not act to depress labor conditions, but should ensure that government and government contractors employ workers at fair wages — continues to prevail. *See, e.g., Walsh v. Schlecht*, 429 U.S. 401, 411 (1977) (Davis-Bacon protects workers, not contractors, setting a floor but not a ceiling for wage rates); *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 177 (1954) (same), *Unity Bank & Trust Co. v. United States*, 756 F.2d 870, 873 (Fed. Cir. 1985) (same); *Building and Constr. Trades Dep't, AFL-CIO v. Donovan*, 712 F.2d 611, 613-14, 620-21 (D.C. Cir. 1983) (noting that Davis-Bacon was designed to counteract the potential effect of the government's low-bid requirement on wages), *cert. denied*, 464 U.S. 1069 (1984).[9] In view of these purposes, we believe that the device of lease-construction, at least to the extent that it is used to build public works outside the prevailing wage system, lies well within the contours of the Act. Whether the government construction is paid for upfront or by means of a long-term lease is of no significance to workers

---

[8] *See, e g.* S Rep No. 74-1155, at 2, H.R Rep No. 71-2453, at 2, 74 Cong Rec at 6510 Some commentators have suggested that the purposes of the Act were not all benign and that some of the concern about outside labor may have been based on the fact that some of the new competition for jobs came from black workers *See* Thieblot at 30, David E Bernstein, *Roots of the 'Underclass' The Decline of Laissez-Faire Jurisprudence and the Rise of Racist Labor Legislation*, 43 Am. U L Rev 85, 114-16 (1993) (arguing that Davis-Bacon reinforced labor unions' discrimination against black workers by eliminating nonunion workers' ability to compete by offering to work for lower wages), 74 Cong. Rec at 6513 (remarks of Rep. Allgood). Indeed, the contract to build the Veterans' hospital in Representative Bacon's district went to an Alabama contractor who brought black laborers to Long Island to build the project Bernstein at 114, *see also* 74 Cong Rec. at 6513 (remarks of Rep Allgood, apparently concerning the project in Rep. Bacon's district) Other Congressmen, however, without discussing the race of the workers involved, argued that the imported workers were being exploited by the substandard wage rates and working conditions. *See, e.g*, 74 Cong. Rec at 6510 (remarks of Rep LaGuardia concerning the situation in Rep Bacon's district)

[9] *See also* Thieblot at 122-23 (quoting *Davis-Bacon Works and Works Well': An Interview with former U.S. Labor Secretary Ray Marshall*, 3 Builders Special Rep (March 7, 1981), in turn quoting Secretary Marshall as stating that "[t]he basic rationale for the Davis-Bacon law is really quite simple It is based on the idea that the federal government should not use taxpayers' money to undercut local area employment conditions . [I]f the federal government permitted its construction dollars to be used [in this way to] undercut prevailing pay standards[, w]e would be helping to drive down wages in any community in which such federal or federally-assisted construction was taking place . ")

who must take lower pay or to local contractors forced to compete by cutting labor costs. The effect on them is the same.

While the public generally has an undeniable interest in paying as little as possible for the construction of public works, the purpose of the Davis-Bacon Act was precisely to subordinate that interest to the extent necessary to set minimum wage standards for such construction work. If an agency decides to construct a public work — not just acquire a privately-owned building — that agency cannot evade the purposes of this country's labor laws by clever drafting. This does not mean that construction related to any lease is "construction, alteration and/or repair" of a public work within the meaning of the Act — but neither can the "plain language" of the Act be read as declaring that a 99-year lease of a brand new building that would never otherwise have been built is not the construction of a public work. The answer in any particular case will depend on the facts.

## C.

The Department of Labor's longstanding interpretation of the Davis-Bacon Act is designed to counteract just such evasion, and the views of the courts, Comptrollers General, and Attorneys General, with few exceptions, support this interpretation of the Act.

The Department of Labor consistently has taken the position that a contract is a contract for construction within the meaning of the Davis-Bacon Act "if more than an incidental amount of construction-type activity is involved in the performance of a government contract." 1987 WAB Opinion at 2 (quoting *In re Military Housing, Ft. Drum*, WAB Case No. 85-16, at 4 (Aug. 23, 1985)). Similarly, the Federal Acquisition Regulations instruct agencies that Davis-Bacon wage rates should be included in nonconstruction contracts involving some construction work when "[t]he contract contains specific requirements for a substantial amount of construction work," 48 C.F.R. § 22.402(b)(ii) (1994), which is "physically or functionally separate from, and is capable of being performed on a segregated basis from, the other work required by the contract," 48 C.F.R. § 22.402(b)(iii). *See also* 29 C.F.R. § 4.116(c)(2) (1994) (providing that Davis-Bacon wage rates shall apply in similar circumstances in contracts otherwise covered by the wage and hour provisions of the Service Contract Act).

This interpretation has been approved by the Comptroller General. *In re Fischer Eng'g & Maintenance Co.*, No. B-223359, 1986 WL 64093, at 2 (C.G. Sept. 16, 1986) (Davis-Bacon applies to lease-construction of military housing, so long as project is "clothed sufficiently with elements indicating that [it] indeed . . . serv[es] a public purpose"); *In re D.E. Clarke*, No. B-146824, 1975 WL 8417, at 1 (C.G. May 28, 1975) (contract is covered if it "essentially or substantially contemplates the performance of work described by the enumerated items"); 40 Comp. Gen. 565, 565, 567 (1961) ("[t]he test for determination of the applicability of the

Davis-Bacon Act . . . is not the nature of the specific work but the nature of the contract, that is, whether the contract essentially or substantially contemplates the performance of work described by the enumerated items 'construction, alteration, and/or repair, including painting and decorating'"; applying this standard to a contract ostensibly dealing with "maintenance," the Comptroller General ultimately determined that the work required was in fact maintenance rather than construction); 34 Comp. Gen. 697 (1955) (lease-purchase agreements fall within the Davis-Bacon and related Acts); 10 Comp. Gen. 461 (1931) (Act applies to temporary housing and other buildings erected for use during construction of the Hoover Dam).

The 1988 O.L.C. Opinion, however, relied heavily on a 1962 Comptroller General opinion at odds with the Comptroller's other cases, without discussing the more recent cases. In that opinion, the Comptroller General argued that leases are never contracts for the construction of public works. 42 Comp. Gen. 47 (1962). The 1962 opinion addressed the concept of lease and lease-option contracts in the abstract, and concluded that such contracts are not Davis-Bacon contracts because "of the basic distinction which exists between the procurement of a right to use improvements, even though constructed for that particular usage, and the actual procurement of such improvements." *Id.* at 49. The opinion asserted that "the mere fact that construction work is prerequisite to supplying a public need or use does not give such work a Davis-Bacon status." *Id.* In rejecting such a sweeping interpretation of the Davis-Bacon Act, the Comptroller General unnecessarily suggested that no leases are covered unless the government ultimately acquires title to the work. In contrast, the Attorney General had already determined that acquisition of title was not necessary to bring a contract within the Davis-Bacon Act, *Wage Law Applicable to Alley Dwelling Authority for the District of Columbia*, 38 Op. Att'y Gen. 229, 233 (1935); and the courts had reached the same conclusion in construing the nearly identical language of the closely related Miller Act, *e.g.*, *United States ex rel. Noland Co. v. Irwin*, 316 U.S. 23 (1942) (construction of Howard University library).

In a later opinion, the Comptroller General emphatically rejected the 1962 opinion's reading of the statute, approving instead the Department of Labor's analysis of a particular lease-construction contract similar to the one involved in the 1988 O.L.C. Opinion. *In re Fischer Eng'g & Maintenance Co.*, No. B-223359, 1986 WL 64093 (C.G. Sept. 26, 1986). The *Fischer Engineering* case emphasized that the 1962 opinion had addressed the issue only in the abstract. Even were we to regard the decisions of the Comptroller General as controlling, which we do not, we think the reasoning of the more recent *Fischer Engineering* case is both more consistent with other Comptroller General opinions and more accurate in its reading of the Act, because it is more attentive to the underlying intent of the Act.

Similarly, the courts have identified the Davis-Bacon Act as a remedial statute that should be "liberally construed to effectuate its beneficent purposes." *E.g.*, *Drivers Local Union No. 695 v. NLRB*, 361 F.2d 547, 553 n.23 (D.C. Cir. 1966) (citing *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 177 (1954), for conclusion that statute is remedial). While the courts have not addressed the lease-construction contract situation directly, except in the *Turnage* case (which concluded that the Crown Point contract was covered by the Davis-Bacon Act), they have made clear that public ownership is not essential for a finding that a contract is for construction of a public work under the related Miller Act. *See, e.g.*, *United States ex rel. Noland Co. v. Irwin*, 316 U.S. 23 (1942) (Howard University library). This and similar cases did not even consider the possibility that the contracts were not for construction; rather they focused on whether the construction was of a public work, defining the term as "including 'any projects . . . carried on either directly by public authority or with public aid to serve the interests of the general public.'" *Id.* at 28, 30 (quoting the National Industrial Recovery Act's definition of "public work" and applying it to a Miller Act bond case). The classic definition of a public work for purposes of the Depression-era labor statutes was set forth in the case of *Peterson v. United States*, 119 F.2d 145 (6th Cir. 1941), which stated that

> The term "public work" as used in the [Miller Act] is without technical meaning and is to be understood in its plain, obvious and rational sense. The Congress was not dealing with mere technicalities in the passage of the Act in question. "Public work" as used in the act includes any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds.
>
> . . . .
>
> There is nothing in [*Title Guaranty & Trust Co. v. Crane Co.*, 219 U.S. 24 (1910) (holding that ships are public works under predecessor Heard Act, though not on public soil, because they are publicly owned)] from which an inference may be drawn that ownership was the sole criterion. To so circumscribe the act would destroy its purpose.

*Id.* at 147. *See also* 29 C.F.R. § 5.2(k) (1994) (project is a public work if it is "carried on directly by authority of or with funds of a Federal agency," and "serve[s] the interest of the general public regardless of whether title thereof is in a Federal agency").

While *Peterson* and other cases do not address directly the question whether a lease-construction contract is covered by the Davis-Bacon Act, they do suggest that a technical reading of the Act that defeats its purpose is inconsistent with the text

as well as the purpose of the Act. *See also Title Guaranty & Trust Co. v. Crane Co.*, 219 U.S. 24 (1910) (ships are public works under Heard Act though not affixed to public property); *Applicability of Certain Acts to Construction, Alteration, and Repair of Coast Guard Vessels, Boats, and Aircraft*, 38 Op. Att'y Gen. 418 (1936) (same, under Davis-Bacon Act); *Fidelity and Deposit Co. v. Harris*, 360 F.2d 402, 408 (9th Cir. 1966) (construction of building for the Jet Propulsion Laboratory at the California Institute of Technology is a public work under the Miller Act); *Autrey v. Williams and Dunlap*, 343 F.2d 730, 734 (5th Cir. 1965) (Capehart Housing Act military housing project is a public work under Miller Act, "[a]lthough title . . . does not pass immediately to the United States, due to the novel financing plan" of the Capehart Act); *United States ex rel. Gamerston & Green Lumber Co. v. Phoenix Assurance Co.*, 163 F. Supp. 713 (N.D. Cal. 1958) (Miller Act applies to construction of post library at the Presidio, though paid for from nonappropriated funds).[10]

Finally, past Attorney General opinions also support a broad reading of the Act. *See, e.g., Federal Aid Highway Program — Prevailing Wage Determination*, 41 Op. Att'y Gen. 488, 500-01 (1960) (definition of mechanics and laborers under Davis-Bacon Act "is not to be given a niggardly construction" because the Act "is to be interpreted broadly to accomplish its purpose"); *Wage Law Applicable to Alley Dwelling Authority for the District of Columbia*, 38 Op. Att'y Gen. 229, 233 (1935) ("broad construction" that Act covers buildings that may be resold to private parties is "supported both by the language of the Act and by the apparent pur-

---

[10] The 1988 Opinion did not address the question whether the clinic construction called for under the Crown Point contract fell within the definition of a "public building[] or public work[]" for purposes of the Davis-Bacon Act, and the status of the Crown Point contract is no longer a matter of dispute in light of *Building and Constr. Trades Dep't, AFL-CIO v Turnage*, 705 F. Supp 5 (D D C 1988) (holding that lease-construction of Veterans Administration outpatient clinic under the Crown Point contract was covered by Davis-Bacon). With respect to the Crown Point contract, however, we would note that veterans' hospitals, when constructed under ordinary financing mechanisms, were among the principal public buildings that the drafters had in mind, *see, e.g.*, 74 Cong. Rec 6510-11 (1931) (remarks of Rep Bacon), *id* at 6506 (chart), and unquestionably serve a public purpose Furthermore, it is well established that the government need not have either initial or permanent title to a building for the construction project to be deemed a public work (though government-owned property presents an easier case) *See, e.g., Wage Law Applicable to Alley Dwelling Authority for the District of Columbia*, 38 Op. Att'y Gen 229 (1935) (housing constructed under D C. Alley Dwelling Authority Act of 1934 is a public work even though it may later be sold to private parties), *United States ex rel. Noland Co v. Irwin*, 316 U S. 23, 29-30 (1942) (construction of Howard University library is a public work under related Miller Act, though library was to be the property of a private university), *Peterson v. United States*, 119 F 2d 145 (6th Cir 1941) (relocation of privately-owned railway that would be flooded by federal dam is a public work) We believe that, in general, the determination whether a lease-construction contract calls for construction of a public building or public work likely will depend on the details of the particular arrangement. These may include such factors as the length of the lease, the extent of government involvement in the construction project, the extent to which the construction will be used for private rather than public purposes, the extent to which the costs of construction will be fully paid for by the lease payments, and whether the contract is written as a lease solely to evade the requirements of the Davis-Bacon Act, a possibility contemplated by the dissenter from the 1987 WAB Opinion. However, we further believe that the fact that a novel financing mechanism is employed should not in itself defeat the reading of such a contract as being a contract for construction of a public building or public work.

poses intended to be accomplished"). The sole exception to this trend is the 1988 O.L.C. Opinion.

The 1988 Opinion quoted language from the 1935 and 1960 Attorney General opinions to suggest that the use of direct federal funds was an absolute requirement for Davis-Bacon coverage, citing a statement in the 1935 opinion that the Act applied to "buildings erected with funds supplied by the Congress," 38 Op. Att'y Gen. at 233, and a statement in the 1960 opinion that it applied to "direct Federal construction," 41 Op. Att'y Gen. at 495. Neither the opinions nor the quoted excerpts suggest that these are the only situations in which Davis-Bacon would apply. In both opinions, the Attorney General explicitly rejected narrow readings of the Act in favor of quite expansive ones, and used the "federal funds" concept to argue that a narrower reading would undermine the Act and the public goals it was designed to serve. Neither opinion discussed lease-construction or any similar construction financing mechanism, nor did either opinion suggest that the Act would not apply if the construction was not built with federal funds but instead was built under federal direction and later paid for with federal funds. A consideration of the context in which these opinions arose will illustrate the point. The 1935 opinion involved construction and demolition of buildings under the D.C. Alley Dwelling Authority, which was empowered to tear down old buildings and construct new ones to redevelop alleys in the District of Columbia. Because the Act contemplated that the new dwellings might later be leased or sold to private parties, it was contended that Davis-Bacon should not apply. Attorney General Cummings, however, determined that the prospect that the buildings would be sold did not detract from the public character of the construction:

> I approve the broad construction which has thus been placed upon the statute and regard it as supported both by the language of the Act and by the apparent purposes intended to be accomplished. Under this view buildings erected with funds supplied by the Congress for the furtherance of public purposes are not to be distinguished, so as to affect the application of the statute, upon consideration of their character or the particular public purpose which their building is intended to further; nor do I regard it as controlling that some of them will be, or may be, conveyed for a consideration to private persons at some time after completion.

38 Op. Att'y Gen. at 233.

The 1988 Opinion's quote from the 1960 opinion is itself a quote from the legislative history of the Federal Highway and Highway Revenue Acts of 1956, and was drawn from a section of the history urging that Davis-Bacon wage standards should apply not only to "direct Federal construction" — highways constructed by the government (without regard to financing mechanisms) — but also to highways

constructed by state and local governments, with federal financial assistance. 41 Op. Att'y Gen. at 495; H.R. Rep. No. 84-2022, at 12-13 (1956); 23 U.S.C. § 113 (successor Act). While the quoted legislative history indicates that the Congress thought that federally-aided *non*federal highway projects were not covered, this distinction is irrelevant to the question at issue here. Neither the 1960 opinion nor the Highway Act nor the quoted legislative history defines "direct Federal construction" in such a way as to exclude lease-construction contracts. The only light these sources shed on the question of how lease-construction should be categorized is to emphasize that where the government is financially responsible for construction costs, the purposes of the Davis-Bacon Act may be implicated. Furthermore, this commentary was meant as background. The question at issue in the 1960 opinion was whether independent owner-operators of trucks on a Davis-Bacon project were nonetheless employee "mechanics and laborers," subject to the Act's prevailing wage requirement. The Attorney General concluded that they were, in part because a "niggardly construction" of the term "mechanics and laborers" would be inconsistent with the remedial purposes of the Act. 41 Op. Att'y Gen. at 500.

In short, the cited Attorney General opinions interpreted the Davis-Bacon Act expansively to ensure that its beneficial purposes would not be evaded. Consequently, we do not think that these opinions support the argument that particular financing mechanisms remove public construction projects, such as those paid for by long-term lease, from the Act.

### D.

One final argument has been put forth to support the conclusion reached by the 1988 Opinion: that Congress, in other statutes, explicitly indicated that Davis-Bacon requirements would apply to particular lease contracts; and that these statutes "indicate[] not only that Congress knows how to insure that leases are covered by the Davis-Bacon Act in those few situations where it so chooses, but also that section 276a(a) by itself does not include leases." 1988 Opinion at 95. The primary statute relied upon is 39 U.S.C. § 410(d)(1), which states that

> A lease agreement by the Postal Service for rent of net interior space in excess of 6,500 square feet in any building or facility, or part of a building or facility, to be occupied for purposes of the Postal Service shall include a provision that all laborers and mechanics employed in the construction, modification, alteration, repair, painting, decoration, or other improvement of the building or space covered by the agreement, or improvement at the site . . . shall be paid [Davis-Bacon wage rates].

121

This statute covers not just the lease-construction of entire buildings, but construction involved in short-term use of relatively small amounts of space in larger buildings, including incidental construction and improvements beyond those cited in the Davis-Bacon Act. It would take a more expansive reading of the Davis-Bacon Act than Labor has urged in this case to match this coverage. In light of this, the House Report cited in the 1988 Opinion almost certainly was correct in concluding that the statute extended Davis-Bacon coverage. H.R. Rep. No. 91-1104, at 27 (1970). Too, the Act was passed in 1970, before the Comptroller General reversed his 1962 decision that Davis-Bacon did not apply to leases. In view of these factors, we do not believe that this statute sheds much light on how Congress intended Davis-Bacon to apply in other lease-construction settings.

## III.

The Department of Labor also suggests that we should defer to its determination whether a particular contract is covered by Davis-Bacon, citing 29 C.F.R. §§ 5.13 and 7.1(d) (1994), Reorg. Plan No. 14 of 1950, 3 C.F.R. 1007 (1950), *reprinted in* 5 U.S.C. app. at 1261 (1988),[11] and a variety of cases. While the authorities cited clearly indicate that Labor has authority to set wage rates, they do not indicate whether Labor's resolution of legal questions relating to coverage disputes supercedes the Attorney General's authority, under Executive Order No. 12146, 3 C.F.R. 409 (1979), to resolve legal disputes between executive branch agencies. Rather, these sources state that the contracting agency has the initial responsibility for determining coverage, *see, e.g., Universities Research Ass'n v. Coutu*, 450 U.S. 754, 759 n.6, 760 (1981); *North Georgia Building and Constr. Trades Council v. Goldschmidt*, 621 F.2d 697, 703 (5th Cir. 1980); and that the Reorg. Plan and Labor Department regulations provide for review by Labor of contracting agencies' coverage determinations. Reorg. Plan No. 14 of 1950; 29 C.F.R. §§ 5.13 and 7.1(d); *Coutu*, 450 U.S. at 760; *North Georgia*, 621 F.2d at 704.[12]

---

[11] Reorg Plan No. 14 provides

In order to assure coordination of administration and consistency of enforcement of the labor standards provisions of each of the following Acts [including the Davis-Bacon Act] by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations, and procedures, which shall be observed by these agencies, and cause to be made by the Department of Labor such investigations, with respect to compliance with and enforcement of such labor standards, as he deems desirable

5 U.S C app at 1261

[12] While the *North Georgia* case also states that the Wage Appeals Board is "authorized [by 29 C F.R. § 7 1(d)] to act with finality on behalf of the Secretary of Labor" in reviewing determinations made by agencies in applying the Davis-Bacon Act, 621 F 2d at 704, the quoted language indicates only that the WAB has final authority to act for the Secretary of Labor and does not indicate whether, and to what extent, the Department's exercise of that authority is reviewable by the Attorney General or by the courts. 29 C F R § 7.1(d) says only that the Board "shall act as fully and finally as might the Secretary of Labor concerning such matters."

It is true that Reorganization Plan No. 14 of 1950 seeks coordination of administration and consistency of enforcement of, among other statutes, the Davis-Bacon Act, and that the Plan places the principal authority for bringing about consistent administration of the statute with the Department of Labor. 5 U.S.C. app. at 1261. That authority, however, must be reconciled with the authority of the Attorney General to make final decisions for the executive branch on legal determinations under Executive Order No. 12146, which provides that the Attorney General may resolve "legal disputes" between executive agencies. *See also* 28 U.S.C. § 511 ("The Attorney General shall give [her] advice and opinion on questions of law when required by the President") and 28 U.S.C. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department"). We believe that, read together, the Davis-Bacon Act, the Reorganization Plan, 28 U.S.C. §§ 511 and 512, and Executive Order No. 12146, while granting the primary responsibility for interpreting Davis-Bacon to Labor, also confer on the Attorney General, at the request of appropriate officials, the authority to review the general legal principles underlying certain of the Secretary's decisions under the Act. *Accord Application of the Davis-Bacon Act to Urban Development Projects that Receive Partial Federal Funding,* 11 Op. O.L.C. 92, 94-95 (1987) (Reorganization Plan 14 "speaks only to the respective functions of HUD [the contracting agency] and Labor in administering [Davis-Bacon provisions of] the Housing and Community Development Act," and "does not preclude either the head of a department from seeking, or the Attorney General from rendering, an opinion on a question of law arising in the administration of his department").[13]

---

[13] This view is consistent with prior decisions of the Attorney General sometimes cited for the proposition that Labor has final authority to interpret the Davis-Bacon Act. Thus, for example, in *Federal Aid Highway Program — Prevailing Wage Determination,* 41 Op Att'y Gen. 488 (1960), the Attorney General agreed only that Labor has authority under the Reorganization Plan and the statute to determine whether certain employees were "laborers or mechanics" within the meaning of the Davis-Bacon Act — not whether the contract itself was covered. Since this opinion resolved a dispute between the Departments of Labor and Commerce over which of those two agencies should make the determination, it did not fully address the question of the extent of the authority of the Department of Justice to review Labor Department legal determinations under the Act

Similarly, in *Office of Federal Procurement Policy — Authority to Determine Whether the Service Contract Act, Walsh-Healev Act, or Davis-Bacon Act Applies to Classes of Federal Procurement Contracts,* 43 Op. Att'y Gen 150 (1979), while the Attorney General did conclude that the Department of Labor had authority to make contract coverage determinations under the Walsh-Healey and Service-Contract Acts that are "binding on the procurement agencies," *id* at 161, and that the Office of Federal Procurement Policy does not have statutory authority to make coverage determinations under those statutes, *id*, these statements do not undermine the authority of the Attorney General to review legal aspects of interagency disputes relating to coverage decisions made by the Department of Labor Furthermore, the 1979 Attorney General opinion made no such express determination concerning the Secretary's authority to make final Davis-Bacon coverage decisions, and indeed, no one had contended that Davis-Bacon covered the particular contract at issue in that case. *See id.* at 151 While the 1979 opinion also stated that Labor has authority to make coverage determinations under "the contract labor standards statutes," including Davis-Bacon, *id* at 153, this statement does not address the disputed question: whether this authority precludes the Department of Justice from reviewing such decisions, and neither the opinion nor the cases cited in support of this passage indicate

## IV.

For these reasons, we conclude that the ruling of the 1988 O.L.C. Opinion that the plain language of the Davis-Bacon Act indicates that it can never apply to a lease that calls for construction of a public work was incorrect. We believe that the determination whether a particular lease-construction contract is a "contract . . . for construction" of a public building or public work within the meaning of the Davis-Bacon Act will depend upon the details of the particular agreement.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

that the Attorney General may not address legal questions arising from Labor Department Davis-Bacon coverage decisions.